In the Matter of GULF OIL CORPORATION, Successor to GULF REFINING COMPANY, Petitioner, for an Order against JOSEPH D. McGOLDRICK, as Comptroller of the City of New York, Respondent.

First Department, February 3, 1939.

*Matthew S. Gibson*, for the petitioner.

*Sol Charles Levine* of counsel [*Jerome R. Hellerstein, Charles H. Birdsall* and *Milton Sandberg* with him on the brief; *William C. Chanler, Corporation Counsel*], for the respondent.

*George deForest Lord* of counsel [*Woodson D. Scott* with him on the brief; *Lord, Day & Lord*, attorneys], for the Cunard White Star Limited, *amici curiœ*.

TOWNLEY, J. This proceeding is brought to review an assessment made by the comptroller of the city of New York against petitioner's predecessor for emergency sales taxes on sales made during the period from December 10, 1934, to December 31, 1935. Petitioner's predecessor has since been dissolved and the petitioner is its successor and has all its rights. The payment of the taxes was duly protested. Petitioner, in fact, did not collect the sales tax on the disputed sales.

Petitioner has sold oil manufactured in bond from crude petroleum imported from Venezuela. The crude petroleum was delivered directly to petitioner's bonded manufacturing warehouse, Class 6, at Gulfport, Staten Island. The bond was issued pursuant to the Warehouse Laws of the United States and the Treasury Regu-

lations. Under the bond petitioner agrees that it shall not permit any materials in its warehouse except such as are used for the manufacture of articles which by law are allowed to be exported free of duty and taxes. The bond is void if the goods used for the purpose specified in the bond are truly exported from the United States. This bond takes the place of the payment of the one-half cent per gallon tax on crude oil imposed by the Revenue Act of 1932. It makes unnecessary later applications for drawbacks after exportation of the refined oil.

Bonded warehouses, Class 6, are provided for in section 311 of the Tariff Act of June 17, 1930 (U. S. Code, tit. 19, § 1311), and article 919 of the Customs Regulations of 1937. A "Class 6" warehouse is one " for the manufacture in bond, solely for exportation, of articles made in whole or in part of imported materials." There is no provision in law for the lawful withdrawing of any such articles (other than cigars and by-products) from Class 6 warehouses for domestic consumption. It is provided in article 940 (b) and (d) of the Customs Regulations of 1937 that the merchandise is not subject to levy, attachment or other process or injunction of a State court and " imported goods in bonded warehouse are exempt from taxation under the general laws of the several States."

It is unnecessary to describe in detail the careful control exercised by government officials over goods that have been taken into Class 6 warehouses. Suffice it to say that the oil is constantly under government supervision until it is pumped into a vessel in foreign trade and cannot be diverted into domestic trade.

The oil claimed to be subject to tax herein is specifically exempt from Federal tax pursuant to section 630█ of the Revenue Act of 1932, which exempts from tax " any article sold for use as fuel supplies * * * on vessels * * * actually engaged in foreign trade or trade between the Atlantic and Pacific ports of the United States or between the United States and any of its possessions. Articles manufactured or produced with the use of articles upon the importation of which tax has been paid under this title, if laden for use as supplies on such vessels, shall be held to be exported for the purposes of section 601 (b)."

All the foregoing acts, regulations and provisions discussed above were enacted by Congress as an express exercise of its power to regulate commerce with foreign nations. The Tariff Act of 1930 is entitled: " An act to provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, to protect American labor, and for other purposes."

The power of Congress to regulate commerce with foreign nations " is exclusive and plenary. As an exclusive power, its exercise may not be limited, qualified or impeded to any extent by State action. * * * The power is buttressed by the express provision of the Constitution denying to the States authority to lay imposts or duties on imports or exports without the consent of the Congress. Art. I, § 10, par. 2." (*Board of Trustees* v. *United States*, 289 U. S. 48.) Under this power Congress may grant rebate of duties upon raw or prepared materials imported, " thus enabling the manufacturer to compete in foreign markets with the same articles manufactured in other countries." (*Tide Water Oil Co.* v. *United States*, 171 U. S. 210.) It was said in *Sinnot* v. *Davenport* (22 How. [U. S.] 227, 243): " The whole commercial marine of the country is placed by the Constitution under the regulation of Congress, and all laws passed by that body in the regulation of navigation and trade, whether foreign or coastwise, is therefore but the exercise of an undisputed power. When, therefore, an act of the Legislature of a State prescribes a regulation of the subject repugnant to and inconsistent with the regulation of Congress, the State law must give way; and this, without regard to the source of power whence the State Legislature derived its enactment."

The history of the legislation permitting the manufacture in bond and export free of duty of articles sold for use as supplies on vessels engaged in foreign trade shows that the purpose was to relieve American manufacturers from a competitive disadvantage. (Senate Report No. 58 on the 1933 Amendment to the Revenue Act of 1932, Seventy-Third Congress, First Session, May 1, 1933, p. 3.) Congressional debates (Congressional Record, May 11, 1933, p. 3212) also establish that the provision dealing with fuel oils was passed because experience had proved that " many of the vessels which carry on the foreign trade heretofore had bought their fuel oil in this country, but since the passage of the tax act they have changed their practice and are filling their tanks abroad in the ports of foreign countries, and we are losing that trade. A provision is recommended [the one finally passed and relied on in this case] by the committee that in the case of fuel oil, ships' stores, and so forth, as involved in this class of foreign trade, the tax shall not be imposed."

Congress decided that its purpose to encourage foreign trade would be thwarted by the imposition of a tax on crude petroleum of one-half cent per gallon. It seems perfectly obvious that its purpose would be more than thwarted by a tax on the consumer of refined petroleum of two per cent of the sale price. This is what the city of New York, however, asserts its right to do.

The city claims that, because of the processing of the crude petroleum which takes place on Staten Island, this petroleum loses its character as an import and emerges from the refinery as new products which, from the point of view of the State of New York, must be deemed an intrastate article of commerce. This contention must be based on a premise to the effect that any processing of completely segregated imported goods, regardless of the declared congressional purpose, commingles these imports *ipso facto* with the general goods of the State.

It has long been established that imports must be commingled with the common goods of the country before they may be taxed. (*Norfolk & Western R. Co.* v. *Sims*, 191 U. S. 441; *Robbins* v. *Shelby Taxing District*, 120 id. 489.) In *Robbins* v. *Shelby Taxing District* (*supra*) it was said: " But in making such internal regulations a State cannot impose taxes * * * upon property imported into the State from abroad, or from another State, and not yet become part of the common mass of property therein." The city, in fact, has not questioned this rule, but says it is inapplicable.

The contention that the processing of this oil under government control while in its exclusive possession changes its essential character cannot be sustained. No authority has ever held that mere processing reduces imports to the status of commingled goods. On the contrary, in a case involving the processing of cotton seed cakes into meal in a terminal warehouse, the Supreme Court of the United States said that the character of the goods as articles of interstate commerce had not been lost by the processing. (*Southern Pac. Terminal Co.* v. *Int. Commerce Comm.*, 219 U. S. 498.) Mere processing of goods as authorized by the act of Congress does not, therefore, change their essential character as imports subject to re-export.

Aside from processing, which we have adverted to above, there is no element in the handling of this crude oil which relaxes in any degree the control of the United States Customs authority. When the crude oil arrives from Venezuela it is immediately delivered into bonded oil tanks at petitioner's bonded manufacturing warehouse; the more volatile liquids therefrom, such as gasoline and gas oil, are removed by heat in the bonded still. The resulting bunker " C " fuel oil is transferred to bonded fuel oil tanks. This bonded fuel oil is delivered from bonded tanks into bonded lighters. From such lighters, still under Customs control and seal, the oil is transferred into bunker fuel tanks of vessels clearing for foreign ports and is listed by the United States Customs authorities as " ships' stores." It is impossible fairly to claim that this oil has become " commingled."

We hold that it is a legitimate exercise of the power of Congress over foreign trade to provide for the segregation of imports so that they may be processed and re-exported. It is also within the power of Congress reasonably to define the word " exports " to include ships' stores. The regulation of the product being so complete and the purpose thereof so manifest as a proper exercise of the power of Congress under the commerce clause, it must be held that the tax is a burden on foreign commerce and repugnant to the expressed intention of Congress.

Petitioner further contends that it is entitled to a refund of taxes collected upon State and Federal gasoline taxes and Federal lubricating oil taxes included in the price paid by retail customers at its filling stations in New York city. The State gasoline taxes are not properly included in the taxable receipts, and petitioner need not have collected the taxes thereon. (*Socony-Vacuum Oil Co., Inc.*, v. *City of New York*, 247 App. Div. 163; affd., 272 N. Y. 668.) While the Federal gasoline taxes are not collected from the purchaser but are paid directly by the seller, for the purpose of the point raised we may treat the two taxes alike. We think that this matter has been decided by the Court of Appeals in *Matter of Kesbec, Inc.*, v. *McGoldrick* (278 N. Y. 293). The factual situations are not substantially distinguishable and the opinions in the Court of Appeals show that all the points now presented were considered by the court. Petitioner is, therefore, not entitled to a refund of the sums collected by it.

The determination of the comptroller should be annulled to the extent indicated in this opinion, with fifty dollars costs and disbursements to the petitioner.

MARTIN, P. J., and O'MALLEY, J., concur; GLENNON and UNTERMYER, JJ., dissent.

UNTERMYER, J. (dissenting). So many questions are involved in the disposition of the appeal that it is impossible, without unduly extending the discussion, to give them all separate consideration. I will, therefore, content myself with a brief statement of the reasons which cause me to dissent.

If the fuel oil on which the tax has been imposed had been sold from a refinery not bonded under section 311 of the Tariff Act of 1930, though under all the other conditions which existed here, I think it could hardly be disputed that the transaction would be taxable by the city of New York under the power delegated to the city by the State. The fuel oil then would not be exempt from State taxation as an export (*Swan & Finch Co.* v. *United States*, 190 U. S. 143; *United States* v. *Chavez*, 228 id. 525), nor would it

constitute a tax upon foreign commerce merely because the fuel oil was destined for consumption in the operation of the vessel to which it was delivered. (*Eastern Air Transport* v. *Tax Commission*, 285 U. S. 147.) It would not be exempt from State taxation by section 630 of the Revenue Act of 1932, which exempts fuel supplies and ships' stores from taxation by the United States " under this title," nor, in my opinion, would Congress have had power to exclude such transactions from taxation by the States. It is not accurate to say that Congress had declared such sales of fuel oil to constitute " exports " or that it has attempted to exempt them from State taxation (assuming that it had such power), for both in section 309 of the Tariff Act of 1930 (19 U. S. Code, § 1309), subdivision (b), and by section 630 of the Revenue Act of 1932 that declaration is expressly limited, in the one case to " the drawback provisions of this Act," and in the other " for the purposes of section 601 (b) " of that act.

The transaction here is not exempted from taxation by article 942 of the Customs Regulations (1931), which provides that " imported goods *in bonded warehouses* are exempt from taxation under the general laws of the several States " (again assuming that Congress had such power). The tax here was not levied upon the fuel oil while in any " bonded warehouses," and did not attach until the oil, under contract of sale, had left the warehouse and was delivered to the ship. It seems to have been recognized that fuel oil should be subject to State taxation when withdrawn from bonded warehouses and delivered to vessels operating in foreign commerce. (*Eastern Air Transport* v. *Tax Commission, supra.*) The many safeguards which are established in order to insure delivery of fuel oil to the vessel are designed only to prevent evasion of the *Federal* tax or duty which is imposed on crude petroleum imported for domestic consumption. These measures do not suggest that Congress has asserted the power to exclude local taxation on local sales of fuel oil *after* it has left " bonded warehouses " and is delivered to the vessel.

The only theory, therefore, on which a claim for exemption can conceivably be made is that the oil was continuously in foreign commerce from Venezuela to the point of delivery at the dock and that at no time throughout all the processes of manufacture and sale did it have a taxable situs in this State. That conclusion involves consequences which are so far-reaching and so dangerous as to require close examination of its premises. For it means that raw material may be imported into the several States to be there manufactured on private property and sold by private corporations, and that, if destined for export or even for transportation to another

State, both the raw material and the finished product are exempt from State taxation. It cannot be said that the crude oil imported from Venezuela was not subjected to manufacture by refining, since it is the undisputed fact that its character was completely changed by the elaborate processes through which it passed. (*Baltimore & Ohio R. Co.* v. *United States*, 15 F. Supp. 674; *Missouri Pacific R. Co.* v. *Schnipper*, 56 F. [2d] 30; *State* v. *Phillips Pipe Line Co.*, 339 Mo. 459; 97 S. W. [2d] 109; affd., 302 U. S. 642; *United Mills Co., Inc.*, v. *Tax Commission of Ohio*, 54 Ohio App. 1; 5 N. E. [2d] 940. See, also, *East Ohio Gas Co.* v. *Tax Commission*, 283 U. S. 465.) The imported crude oil was converted as completely as ore which is imported from abroad and exported as steel, or as logs imported from abroad and exported as lumber. In the process of refining, several of the constituent ingredients of the crude oil were withdrawn and sold here for domestic use, the residue only constituting the bunker fuel oil which is the subject of this proceeding. The refining of the crude oil here was not a mere incident for convenience in transportation, as was the case in the decisions on which the petitioner relies. The *only* purpose for the importation of the crude oil into the United States was the refining and sale here. If, then, property having a situs within the State for the purposes both of manufacture and sale may be withdrawn from State taxation because the finished product is destined, however irrevocably, for use elsewhere, transactions of great magnitude which have heretofore been regarded as subject to local taxation will be exempt, to the great detriment of the States. The fact that the oil was manufactured in bond not to be sold for domestic use does not affect that question. Property thus isolated is none the less taxable. (*Carstairs* v. *Cochran*, 193 U. S. 10.)

It is true that it is the policy of the Federal government to exempt such importations of fuel oil from *Federal* taxation. That purpose is disclosed by the elaborate provisions for manufacture in bonded warehouses. But that furnishes no reason for also exempting from State taxation property which has a situs in the State and to which, furthermore, if I am correct, Congress has not attempted to grant such an immunity. The argument would seem to amount to this, that the States may not tax property which the Federal government, on grounds of public policy, has exempted from Federal taxation. That argument is manifestly untenable. To my mind it is incongruous to hold that a transaction concluded in this State for the sale of property situated and manufactured here is exempt from taxation by the State under whose protection all these operations have occurred.

The determination of the comptroller of the city of New York should in all respects be confirmed.

GLENNON, J., concurs.

Determination annulled to the extent indicated in opinion of TOWNLEY, J., with fifty dollars costs and disbursements to the petitioner. Settle order on notice.