**IDLEWILD BON–VOYAGE LIQUOR CORP., Plaintiff,**

v.

**Martin C. EPSTEIN et al., Defendants.**

United States District Court
S. D. New York.

Argued Oct. 5, 1962.

Decided Dec. 27, 1962.

———◆———

Charles H. Tuttle and Kelly & Schwartz, New York City (John F. Kelly, New York City, of counsel), for plaintiff.

Irving Galt, Asst. Sol. Gen. of New York (Louis J. Lefkowitz, Atty. Gen. of New York, George D. Zuckerman, Deputy Asst. Atty. Gen. of New York, on the brief), for defendants.

Before HAYS, Circuit Judge, and DAWSON and BONSAL, District Judges.

HAYS, Circuit Judge.

Plaintiff is a New York corporation engaged in the business of selling tax-free bottled wines and liquors for export to departing passengers at New York International Airport. Upon advice of the Attorney General of the State of New York, the New York State Liquor Authority, the members of which are defendants herein, informed plaintiff that its business was illegal as unlicensed and unlicensable under the provisions of the New York Alcoholic Beverage Control Law. Thereupon plaintiff instituted this action to enjoin the Liquor Authority from interfering with its business. The complaint seeks a judgment declaring the state statute, as applied, repugnant to the Commerce, Export-Import, and Supremacy clauses of the United States Constitution, and Section 311 of the Tariff Act of 1930, 19 U.S.C. § 1311.

Plaintiff's original motion for the impanelling of a three judge court to consider these claims was denied. The judge to whom the application was made ruled that the case was a proper one for application of the doctrine of "equitable abstention", see Harrison v. NAACP, 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959), and retained jurisdiction while referring the cause to the state courts for determination of the issues presented. Idlewild Bon Voyage Liquor Corp. v. Rohan, D.C., 188 F.Supp. 434. An appeal to the Court of Appeals for the Second Circuit was dismissed on jurisdictional grounds, one judge dissenting. Id. 289 F.2d 426. While unambiguously stating the view of all the judges on the panel that the district court had acted erroneously, and that a "three-judge district court should have been convened" to pass upon, *inter alia*, the abstention issue, Id. 289 F.2d at 430, the majority felt constrained to dismiss the appeal under the rule of Stratton v. St. Louis, S.W. Ry., 282 U.S. 10, 51 S.Ct. 8, 75 L.Ed. 135 (1930). The Supreme Court granted certiorari [1] and remanded the cause. Agreeing with the Court of Appeals that a three judge court should have been convened [2] the Court ruled that the Court

---

1. Idlewild Bon Voyage Liquor Corp. v. Rohan, 368 U.S. 812, 82 S.Ct. 39, 7 L. Ed.2d 21. The Court also granted a motion for leave to file a petition for a writ of mandamus to the district court. Formal action on the petition was deemed unnecessary. 370 U.S. 713, 716, 82 S.Ct. 1294.

2. "We agree with the Court of Appeals that a three-judge court should have been convened in this case. When an application for a statutory three-judge court is addressed to a district court, the court's

inquiry is appropriately limited to determining whether the constitutional question raised is substantial, whether the complaint at least formally alleges a basis for equitable relief, and whether the case presented otherwise comes within the requirements of the three-judge statute. Those criteria were assuredly met here, and the applicable jurisdictional statute therefore made it impermissible for a single judge to decide the merits of the case, either by granting or by withholding relief." 370 U.S. at 715, 82 S.Ct. at 1296.

of Appeals was not without power to correct a single judge who erroneously invaded the province of a three judge court, and remanded the cause to the district court for the convening of a three judge court "to consider this litigation." 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962). This court was convened pursuant to that order.

Plaintiff's place of business is located on the second floor of the Arrivals Building[3] at Idlewild Airport[4] in space rented from the Port of New York Authority under a lease by the terms of which the demised premises may be used only as "an office in connection with the sale * * * of in-bond wines and liquors". The building plans for these premises and the premises themselves were inspected and approved by United States Customs Officials at Idlewild.

Operating from these premises, plaintiff receives orders and payment from passengers departing by plane for foreign countries. Sales are made only to passengers who present tickets and boarding cards indicating their imminent departure. While payment is made at the time of sale, the passenger is given only a receipt. The merchandise is delivered aboard the departing aircraft on documents approved by United States Customs, with instructions to the air line to deliver to the passenger purchaser only upon arrival at the foreign destination. This procedure was approved in 1958 by the Bureau of Customs of the United States Treasury Department, by letter of the Acting Commissioner of Customs to the New York Collector of Customs.

Plaintiff purchases the beverages it sells from several bonded wholesalers located outside the State of New York, who deal in tax free liquors for export. Upon receipt of an order from plaintiff, the merchandise is withdrawn from a bonded warehouse on Customs Form 7512, and shipped via bonded trucker to plaintiff's premises at Idlewild. One copy of the form is mailed by the wholesaler to the United States Customs Office at Idlewild, a second copy is mailed to plaintiff, a third sealed copy accompanies the shipment, and is delivered to Customs upon arrival at Idlewild. The contents of the order are received and counted by plaintiff, and entered in its records. The liquor is then stored at plaintiff's premises until resold to foreign-bound passengers, at which time a withdrawal from inventory is noted in the records. When the entire order has been resold, the records are submitted to the customs inspector at Idlewild.

Plaintiff's books, records and inventory are open to inspection by customs officials at any time, and such inspections do in fact take place. The Bureau of Customs is free to supervise the unloading of the merchandise from the bonded trucks and its transportation to plaintiff's premises as well as its delivery by plaintiff to departing aircraft, and has in fact done so "numerous times".

The plaintiff's sales amount to several hundred bottles a day, the largest sales for a single day being 735.

Upon advice of the Attorney General of the State of New York, the Liquor Authority informed plaintiff, in July 1960, that its operation was illegal under the provisions of the New York Alcoholic Beverage Control Law. The Attorney General was of the opinion that plaintiff was engaged in "selling" alcoholic beverages within the meaning of § 3 [28] of that Act,[5] that a license was therefore

3. Orders are also taken at two small areas in other buildings at the airport and phoned to the main office in the arrivals building.

4. The Port of New York Authority leases the land on which Idlewild Airport was built from the City of New York. Unlike the situation arising when land is ceded by a state to the federal government for military or other purposes, the compact between New York and New Jersey creating the Port Authority did not alter the territorial boundaries nor substantially affect the jurisdiction of either state. See N.Y.Unconsol.Laws §§ 6421, 6836 (McKinney 1961).

5. " 'Sale' means any transfer, exchange or barter in any manner or by any means whatsoever for a consideration, and includes and means all sales made by any

required under § 100 [1] [6], but that plaintiff was not licensable, citing Rule 17 of the Rules of the State Liquor Authority, McKinney's Consol.Laws, Book 3, Appendix, limiting the number of licenses issued in each county, and § 105 (2) of the Act.[7] In response to this opinion, the New York Importers and Distillers Association circularized its members advising them that under § 62 of the Alcoholic Beverage Control Law, they could not legally fill plaintiff's orders. The Liquor Authority notified at least one of the truckers delivering merchandise to plaintiff that the trucker was assisting in violations of the law. The trucker thereafter refused to make deliveries. Thus plaintiff is clearly threatened with irreparable injury, since it will be put out of business by the Liquor Authority unless it is successful in this action.

An examination of the New York Alcoholic Beverage Control Law as a whole suggests a considerable doubt as to its applicability to plaintiff's operations. The definition of sale in Section 3(28) provides that " 'To sell' * * * shall include the delivery of any alcoholic beverage in the state." This, of course, is inapplicable to plaintiff's sales. Whatever may be the purpose of Section 105 (2) in requiring that a retail liquor store have an entrance from the street level and be located on a public thoroughfare, the requirements, which may be appropriate where liquor purchases are delivered directly to the customer, seem quite irrelevant to a concern which sells liquor exclusively for delivery in a foreign country.

It is entirely probable that the legislature in adopting a statute governing the sale of liquor in New York State did not have within its contemplation the establishment of such a business as plaintiff conducts. The declaration of policy contained in Section 2 of the Alcoholic Beverage Control Law refers to sale and distribution "within the state" and states that: "The restrictions, regulations and provisions contained in this chapter are enacted by the legislature for the protection, health, welfare and safety of the people of the state." The declared "purpose of fostering and promoting temperance" would appear to be appropriate to the consumption of liquor in New York rather than in various foreign countries.

It also seems to us to be reasonably certain that the courts of the State of New York would reject as unlawful the attempt of the State Liquor Authority to terminate plaintiff's business. In During v. Valente, 267 App.Div. 383, 46 N.Y.S. 2d 385 (1944), the court held that the provisions of the Alcoholic Beverage Control Law were inapplicable to the sale of liquor located in the Free Trade Zone of the Port of New York. The court said at 46 N.Y.S.2d 387:

"Counsel for New York State Liquor Authority argues that the provisions of the Alcoholic Beverage Control Law apply to goods within the trade zone because by the creation of the trade zone no cession of any territory was made to the Federal Government. It is asserted that in the absence of any cession the land is a part of the State of New York and subject to its laws.

person, whether principal, proprietor, agent, servant or employee of any alcoholic beverage and/or a warehouse receipt pertaining thereto. 'To sell' includes to solicit or receive an order for, to keep or expose for sale, and to keep with intent to sell and shall include the delivery of any alcoholic beverage in the state." N. Y. Alcoholic Beverage Control Law, McK. Consol.Laws, c. 3–B, § 3 [28].

6. "No person shall * * * sell at wholesale or retail any alcoholic beverage within the state without obtaining the appropriate license therefor required by this

chapter." Section 100 [1] of the N.Y. Alcoholic Beverage Control Law.

7. "No premises shall be licensed to sell liquors and/or wines at retail for off premises consumption, unless said premises shall be located in a store, the entrance to which shall be from the street level and located on a public thoroughfare in premises which may be occupied, operated or conducted for business, trade or industry or on an arcade or sub-surface thoroughfare leading to a railroad terminal." Alcoholic Beverage Control Law § 105 [2].

"The fact that this trade zone is within the geographical limits of the State of New York is not controlling. This Court had occasion to consider the status of goods under control of the Federal Government for the purpose of re-export in Gulf Oil Corp. v. McGoldrick, 256 App. Div. 207, 9 N.Y.S.2d 544, affirmed 281 N.Y. 647, 22 N.E.2d 480, affirmed with opinion 309 U.S. 414, 60 S.Ct. 664, 84 L.Ed. 840. It was there held that the mere geographical location of the goods within the state of New York did not constitute an import into the state and that the sale of such goods was not subject to local regulation or tax. This decision seems conclusive of this case.

"It is urged, however, that the Twenty-first Amendment to the Federal Constitution puts Portuguese Brandy on a status different from that of crude oil. The amendment in so far as relevant provides that:

" 'The transportation or importation into any State, Territory, or possession of the United States *for delivery or use therein* of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.' (Italics our own.)

"By its terms the Amendment grants power to a state to regulate traffic in liquor only to the extent that such liquor is transported or imported for delivery or use within such state. The complaint contains no allegation from which it could be inferred that the sale involved the importation of the liquor into the State of New York within the meaning of the amendment."

See also Gulf Oil Corp. v. McGoldrick, 256 App.Div. 207, 9 N.Y.S.2d 544, affirmed 281 N.Y. 647, 22 N.E.2d 480 (1939), affirmed 309 U.S. 414, 60 S.Ct. 664, 84 L.Ed. 840 (1940); Rosenblum v. Frankel, 279 App.Div. 66, 108 N.Y.S.2d

6 (1951), where the court cited During v. Valente for the statement that:

"the regulatory powers of the State Liquor Authority [do not] extend to international transactions, even in alcoholic beverages, except sales for domestic consumption in New York," 108 N.Y.S.2d at 9.

The probability that the New York courts would decide either that the Alcoholic Beverage Control Law was inapplicable to plaintiff's business, or that its application would be an unconstitutional interference with the power of Congress over foreign commerce (see cases supra) would lead us, under a technical application of the doctrine of abstention, to leave the determination of these issues to the state courts. Under the peculiar circumstances of the present case we think that those conclusions argue for the opposite result, and that we should decide the constitutional issue which has been presented.

We do not think that we should send this operator of a small business trudging into the New York courts to undertake, after more than two and a half years already spent in litigation, many more months of court procedures, especially when it appears to us to be a foregone conclusion that, after carrying the case to the New York Court of Appeals, or, if need be, to the United States Supreme Court, he would certainly obtain the relief he now seeks. To do so would constitute a mechanical application of the doctrine of constitutional abstention in complete disregard of the reasons for the existence of that doctrine and of the equitable aspects of the instant case.

█ The doctrine of abstention is equitable in origin [8], and we should balance the injustice of subjecting plaintiff to additional expense and delay against the advantages which may accrue from adherence to the traditional policy of avoiding constitutional adjudication. In doing so we should remember that the

---

8. See Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 500–501, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

procedure of the three judge court with direct appeal to the Supreme Court, was established for the determination of these issues at least partly because of the need for speedy resolution of the controversies. In the present case the Supreme Court remanded "for expeditious action".

That expense and delay and the probability of the result should be given equitable weight is indicated by City of Chicago v. Atchison, T. & S.F. Ry., 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958), where the majority of the court rejected the dissenting view which would have required application to state authorities. The Court said:

> "Remission to [the state] courts would involve substantial delay and expense, and the chance of a result different from that reached below, on the issue of applicability, would appear to be slight." 357 U.S. at 84, 78 S.Ct. at 1067.

See also Allegheny County v. Frank Mashuda Co., 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959):

> "The undesirability of a refusal to exercise jurisdiction in the absence of exceptional circumstances which clearly justify an abstention is demonstrated by the facts of this case. Respondents have consumed considerable time and expense in pursuing their claim that their property has been unlawfully taken. To order them out of the federal court would accomplish nothing except to require still another lawsuit, with added delay and expense for all parties. This would be a particular hardship for the respondents, who, besides incurring the added expense, would also suffer a further prolonged unlawful denial of the possession of their property if ultimately they prevail against the County and its lessee. It exacts a severe penalty from citizens for their attempt to exercise

rights of access to the federal courts granted them by Congress to deny them 'that promptness of decision which in all judicial actions is one of the elements of justice.' Forsyth v. Hammond, 166 U.S. 506, 513 [17 S.Ct. 665, 41 L.Ed. 1095]." 360 U.S. at 196–97, 79 S.Ct. at 1067.

And see Public Utilities Comm'n v. United Fuel Gas Co., 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396 (1943):

> "Where the disposition of a doubtful question of local law might terminate the entire controversy and thus make it unnecessary to decide *a substantial constitutional question,* considerations of equity justify a rule of abstention. But where, as here, no state court ruling on local law could settle the federal questions that necessarily remain, and where, as here, the litigation has already been in the federal courts an inordinately long time, considerations of equity require that the litigation be brought to an end as quickly as possible." 317 U.S. at 463, 63 S.Ct. at 373. (Emphasis supplied).

In the present case both parties urge that we should not abstain. They seek to avoid the "substantial delay and expense" that would result from submission of the issue to the state courts.[9] Counsel for the State of New York has stipulated that:

> "the state will not press its defense of equitable abstention, but in its anxiety to have the matter disposed of at the earliest possible moment, will proceed for full submission to this court.

> "We feel that the operations of this plaintiff have gone unchecked for two and a half years, and we would like, if possible, to submit this for the earliest possible disposition of the case on the merits."

---

9. The reference by the Supreme Court in the prior appeal in this case to the fact that the district court originally abstained "although there was no relevant litigation then pending in the state courts", 370 U.S. at 714, 82 S.Ct. at 1296, lends some credence to plaintiff's contention that the Court intended us to reach the merits in this determination.

In addition to these considerations, the constitutional issue which we decide is one of extremely narrow compass. The case is quite unlike Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) where the Court said:

"The complaint of the Pullman porters undoubtedly tendered a substantial constitutional issue. It is more than substantial. It touches a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open." 312 U.S. at 498, 61 S.Ct. at 644.

Our decision will not interfere with New York's administration of its liquor control laws except in the one particular of prohibiting the continuation of this plaintiff's business. We do not even decide that New York cannot regulate and supervise the operation of plaintiff's business in the interest of those considerations which are the basis of its Alcoholic Beverage Control Law.

Not only will our decision have no widespread implications for the enforcement of New York's laws with respect to sale of liquor, it will have no important repercussions in the conduct of that business generally. Plaintiff's operation is a small one. We are not made aware that there is any other like it in New York or elsewhere. If others exist apparently no effort has been made to eliminate them. Moreover the very nature of the business allows for only a few such enterprises and an operation very limited in size and scope. The fact is that whether or not plaintiff is permitted to continue its business is apparently of very little moment to anyone except plaintiff itself.

Under these circumstances to abstain from deciding the issue before us would be to reduce the doctrine of abstention to the status of a meaningless formality.

We turn then to the constitutional issue involved in plaintiff's contention that the application to its business of the New York Alcoholic Beverage Control Law in the manner threatened is repugnant to the Commerce Clause of the United States Constitution. There is no doubt that the threatened application would be constitutionally invalid if the case involved legitimate articles of commerce other than alcoholic beverages.[10] The Liquor Authority contends, however, that the attempted regulation is a valid exercise of the state police power over alcoholic beverages, and as such, is not an undue burden on commerce; or alternatively, that it is valid by reason of the Twenty-first Amendment to the Constitution of the United States. We do not agree.

It has long been settled that commerce in alcoholic beverages is not beyond the scope of protection of the Commerce Clause, Leisy v. Hardin, 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128 (1890); Bowman v. Chicago & N. Ry., 125 U.S. 465, 8 S.Ct. 1062, 31 L.Ed. 700 (1888), and that unreasonable burdens on such commerce must fall unless validated by the Twenty-first Amendment. See State Board of Equalization of California v. Youngs Market, 299 U.S. 59, 62, 57 S. Ct. 77, 81 L.Ed. 38 (1936) (dictum). Because of the potentially injurious effects of intoxicating liquor, "the peculiar difficulties of controlling it [and] * * * its tendency to get out of legal bounds," commerce in alcoholic beverages may be subjected to more extensive local regulation than commerce in less injurious products. Duckworth v. Arkansas, 314 U.S. 390, 396, 62 S.Ct. 311, 86 L.Ed. 294 (1941). But the regulation must nevertheless be "reasonably necessary to protect the local public interest in preventing unlawful distribution or use of liquor within the state." Ibid.

In the Duckworth case appellant, a trucker, was convicted of transporting

10. See e. g. Lemke v. Farmers Grain Co., 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458 (1922) (grain); West v. Kansas Natural Gas Co., 221 U.S. 229, 31 S.Ct. 564,

55 L.Ed. 716 (1911) (gas). Cf. H. P. Hood & Sons v. Du Mond, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949) (milk).

intoxicating liquor through the state without first having obtained the required Arkansas permit. The permit was required as "a means of establishing the identity of those who are to engage in the transportation, their route and point of destination, and [to] affords opportunity for local officials to take appropriate measures to insure that the liquor is transported without diversion, in conformity to the permit." Ibid. It was available to qualified carriers for a nominal fee. In upholding the validity of the permit requirement the Court stated:

> "Where the power to regulate commerce for local protection exists, the states may adopt effective measures to accomplish the permitted end. The Arkansas statute does not conflict with any act of Congress. It does not forbid or preclude the transportation, or interfere with the free flow of commerce among the states beyond what is reasonably necessary to protect the local public interest in preventing unlawful distribution or use of liquor within the state. It does not violate the commerce clause. Cf. Ziffrin, Inc. v. Reeves, 308 U.S. 132 [60 S.Ct. 163, 84 L.Ed. 128]." 314 U.S. at 396, 62 S.Ct. at 314.

■ The action threatened against plaintiff is his elimination from the business in which he engages. It is not applied with the purpose of "preventing unlawful distribution or use of liquor within the state." It appears that regardless of any measures taken by plaintiff to insure against diversion of its products into New York or to render its operations open to inspection or control by state officials, the required license will not be made available. New York no doubt has power to regulate plaintiff's operation for local protection. The action proposed is not directed to that end.[11]

■ It is argued, however, that no requirement of reasonableness is imposed under the Twenty-first Amendment. In terms, the amendment refers only to "transportation or importation *into* any State * * * for delivery or use therein of intoxicating liquors, in violation of the laws thereof * * *" [emphasis supplied].[12] It is well settled that the states may control importation of intoxicating liquors into their territories without regard to the Commerce Clause.[13] But we are not here concerned with shipments into New York for "delivery or use therein". While the liquor sold by plaintiff passes through New York state and payment for it is made there, it is neither finally delivered nor used until the passenger purchaser arrives at his foreign destination.

In Collins v. Yosemite Park, 304 U.S. 518, 58 S.Ct. 1009, 82 L.Ed. 1502 (1938),

11. This also disposes of defendant's argument that the regulation is authorized by the Wilson Act, 27 U.S.C. § 121, or by the Webb-Kenyon Act, 27 U.S.C. § 122, which were designed to preclude further application of the "original package doctrine" to commerce in intoxicating liquors. We do not read these statutes to authorize any and all kinds of local regulation of interstate or foreign commerce in alcoholic beverages, but only such regulation as is reasonably related to the protection of valid local interests.

Even if these statutes were to be accorded a broader meaning, it must be recalled that plaintiff's operations are conducted pursuant to the tax free export program established by § 311 of the Tariff Act of 1930, 19 U.S.C. § 1311. While there is no reason to suppose that Congress intended to preempt any and all state regulation applicable to exports under § 311, it must at least have intended to repeal *pro tanto* any existing legislation which would authorize state regulation totally nullifying the program.

12. "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." Constitution of the United States, Amendment XXI, § 2.

13. See Finch & Co. v. McKittrick, 305 U. S. 395, 59 S.Ct. 256, 83 L.Ed. 246 (1939); Mahoney v. Joseph Triner Corp., 304 U.S. 401, 58 S.Ct. 952, 82 L.Ed. 1424 (1938); State Board of Equalization of California v. Youngs Market, 299 U.S. 59, 57 S.Ct. 77, 81 L.Ed. 38 (1936).

384

the park authority sued to enjoin enforcement of the California Beverage Control Law within the park, and its application to beverages sought to be shipped into the park from other states. The Court ruled that cession of the park to the federal government had completely divested California of power to regulate liquor traffic within its confines, and that the California licensing provisions were accordingly invalid as applied. Application of these provisions prior to arrival of the liquor within the confines of the park was also held invalid. In rejecting the argument that the Twenty-first Amendment authorized the regulation under attack, the Court said:

"The lower court was of the opinion that though the Amendment may have increased 'the state's power to deal with the problem * * *, it did not increase its jurisdiction.' With this conclusion, we agree. As territorial jurisdiction over the Park was in the United States, the State could not legislate for the area merely on account of the XXI Amendment. There was no transportation into California 'for delivery or use therein.' The delivery and use is in the Park, and under a distinct sovereignty." 304 U.S. at 538, 58 S.Ct. at 1018 (footnotes omitted).[14]

This analysis is clearly applicable here. "Delivery or use" of the liquors sold by plaintiff is not in New York but in some foreign country, obviously beyond the reach of the laws of New York. Plaintiff's products merely pass through New York on their way to their foreign desti-

nations. The state cannot completely halt such passage.

Defendants would have us read the Collins case more narrowly to apply only where liquor is en route to a federal reservation. In answer suffice it to say that the Supreme Court has not done so. In Carter v. Commonwealth of Virginia, 321 U.S. 131, 64 S.Ct. 464, 88 L.Ed. 605 (1944), the Court cited the Collins case for the proposition that "shipment through a state is not transportation or importation into the state within the meaning of the [twenty-first] Amendment." (321 U.S. at 137, 64 S.Ct. at 468).[15]

It is argued, however, that although *final* delivery of the liquors sold by plaintiff does not take place in New York, there is nevertheless a delivery from the wholesaler to the plaintiff which renders the Twenty-first Amendment applicable and Collins inapplicable. But the state has no interest in the delivery as such. "Delivery" as well as "use" is subject to state regulation because of the possibility that the liquor may be diverted from its intended destination and consumed instead in the state in which it is delivered. The cases relied upon by the defendants establish no more than the power of the states through which liquor passes or in which it is delivered for redelivery elsewhere to enact legislation to guard against such diversion.

Defendants place particular reliance on Ziffrin, Inc. v. Reeves, 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128 (1939) in which appellant, an Indiana trucking corporation holding a certificate under the Fed-

14. Accord, Johnson v. Yellow Cab Transit Co., 137 F.2d 274 (10th Cir. 1943), affirmed, 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814 (1944).

15. See also Nippert v. City of Richmond, 327 U.S. 416, 425 n. 15, 66 S.Ct. 586, 591, 90 L.Ed. 760, 765–66:
"Thus, even the commerce in intoxicating liquors, over which the Twenty-first Amendment gives the States the highest degree of control, is not altogether beyond the reach of the federal commerce power, at any rate when the State's regulation

squarely conflicts with regulation imposed by Congress governing interstate trade or traffic, United States v. Frankfort Distilleries, 324 U.S. 293 [65 S.Ct. 661, 89 L.Ed. 951], whether or not also in some instances in addition to complete exclusion from passing through the State, Collins v. Yosemite Park Co., 304 U.S. 518 [58 S.Ct. 1009, 82 L.Ed. 1502] in the absence of such congressional action. Cf. Carter v. Virginia, 321 U.S. 131, 137 [64 S.Ct. 464, 88 L.Ed. 605]; Ziffrin v. Reeves, 308 U.S. 132, 140 [60 S.Ct. 163, 84 L.Ed. 128]."

eral Motor Carrier Act, sought to enjoin application of the Kentucky Liquor Control Law to its activities while operating as a contract carrier transporting whiskey from Kentucky directly to Illinois. The Act required carriers of alcoholic beverages to hold a transport license, which license was available only to persons holding a State Common carrier's certificate. Plaintiff had been denied such a certificate. In affirming the denial of relief below, the Court used language that was extremely broad.

Subsequent decisions have clearly retreated from the broad language in Ziffrin and have recognized that the result there reached could not be justified in the absence of reasonable state concern over the possibility of diversion of through liquor shipments to local users.[16] Two years after the decision in Ziffrin, the court in Duckworth v. Arkansas, supra, expressly refused to base its decision on the Twenty-first Amendment (although, as pointed out by Justice Jackson, concurring, 314 U.S. at 397, 62 S.Ct. at 314, it could well have done so). And the decision in Carter v. Virginia, 321 U.S. 131, 64 S.Ct. 464 (1944), was rested on an even narrower ground. The state regulations there challenged required that carriers of intoxicating liquors through the state in interstate commerce (1) use the most direct route and carry a bill of lading describing the route and (2) post a $1,000 bond conditioned on lawful transportation, and that (3) the true consignee be named in the bill of lading and be one who had a legal right to receive the shipment at destination. Appellants were seeking to run liquor across Virginia into North Carolina in violation of the laws of the latter state when they were apprehended in Virginia. In upholding the convictions under the Virginia statute, the court recognized that state's valid concern with the possibility of diversion to local users, but placed its decision on still narrower grounds, saying:

"It is enough that Virginia could conclude, in the absence of contrary federal legislation, that she could not safely permit the transportation of liquor through her territory by those who concededly mean to break federal laws and the laws of a neighboring state." 321 U.S. at 137–138, 64 S.Ct. at 468.

The most recent Supreme Court decision on the point is Gordon v. Texas, 355 U.S. 369, 78 S.Ct. 363, 2 L.Ed.2d 352 (1958), in which the facts closely resembled those in Carter. The defendant Gordon had entered Texas from Mexico and was en route to his home in North Carolina with over two gallons of Mexican rum in his possession when the Texas authorities demanded payment of a state tax due on the rum. The tax was payable only by persons not holding a state permit to import intoxicating liquors or to transport them through the state.[17] Gordon had neither obtained nor applied for a permit,[18] and his importation of the

16. The thrust of the dicta in Ziffrin is that the Twenty-first Amendment completely removed alcoholic beverages from the scope of application of the commerce clause. This view would not only render state regulation valid but federal regulation invalid. However this extreme position has been consistently rejected. See United States v. Frankfort Distilleries, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951 (1945) (Sherman Act); Washington Brewers Institute v. United States, 137 F.2d 964 (9th Cir. 1943) (same); Jameson & Co. v. Morgenthau, 307 U.S. 171, 59 S.Ct. 804, 83 L.Ed. 1189 (1939) (Federal Alcohol Administration Act); Arrow Distilleries, Inc. v. Alexander, 109 F. 2d 397 (7th Cir. 1940) (same). See also Dowling Bros. Distilling Co. v. United States, 153 F.2d 353 (6th Cir. 1946) (upholding federal price regulations under war powers); Taub v. Bowles, 149 F.2d 817 (U.S.Emergency Ct.App.1945) (same).

17. See Brief for Appellee, pp. 8–11, Gordon v. Texas, 355 U.S. 369, 78 S.Ct. 363, 2 L.Ed.2d 352 (1958).

18. He was therefore without standing to challenge the Texas statute on the ground that he probably could not have obtained a permit to transport liquor across the state by private automobile. See 2 Vernon's Ann.Tex.P.C., arts. 666–4(a), 666–15(12) (1948).

rum into his home state of North Carolina would apparently have violated the laws of that state.[19] Defendant's conviction for possession of illicit beverages— i. e. beverages on which a tax was payable and unpaid—was affirmed by the Supreme Court in a three line per curiam decision citing the Twenty-first Amendment and Carter v. Virginia.

We read the Gordon decision as no more than a reaffirmance of the narrow holding in Carter, supra. At most, Gordon v. Texas can be read 'to authorize application of state licensing provisions to through traffic in alcoholic beverages when there is a substantial possibility of diversion or use of the liquor within the state and the state regulation as applied serves to check such diversion or use.

 It is possible that there are some types of operations in the course of dealing in liquor which would present such danger of diversion of the liquor that ordinary measures of regulation and supervision would not suffice and therefore even transportation through the state could properly be forbidden. Plaintiff's operation is certainly not such a type. From the time the liquor enters the state until its departure, it is constantly subject to supervision and control by officials of the United States Bureau of Customs. Plaintiff's records and inventory are always open to inspection by Customs officials, and such inspections have often taken place. The possibility of theft of liquor from plaintiff's premises, located as they are in the middle of the world's largest international air terminal, is minimal. In fact, the Liquor Authority has neither alleged nor proved the diversion of so much as one bottle of plaintiff's merchandise to users within the state of New York.

The case before us does not, therefore, involve reasonable measures aimed at preventing unlawful diversion or use of alcoholic beverages within New York.

19. See N.C.Gen.Stat. § 18–58 (Supp.1961). It is not clear, however, that the Supreme

The Liquor Authority does not seek to use the power of New York to regulate or supervise. It seeks to terminate. This it cannot constitutionally do.

Settle order on notice.

Court was aware of this factor. The Texas brief did not mention it.