AMMEX WAREHOUSE COMPANY OF SAN YSIDRO, INC., and Ammex Warehouse Company, Inc., Plaintiffs,

v.

DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL FOR the STATE OF CALIFORNIA, Malcolm Harris, Director for the State of California, Arthur F. Brown, District Supervisor, Southern District of the Department of Alcoholic Beverage Control, James D. Keller, District Attorney for San Diego County, California, and James E. Marable, District Attorney for Imperial County, California, Defendants.

No. 2752.

United States District Court
S. D. California, S. D.
Nov. 27, 1963.

Schall, Nielsen & Boudreau, San Diego, Cal., for plaintiffs.

Warren H. Deering, Deputy Atty. Gen., Los Angeles, Cal., for defendants.

Before JERTBERG, Circuit Judge, and YANKWICH and JAMES M. CARTER, District Judges.

JAMES M. CARTER, District Judge.

This case involves the question as to whether the State of California, through its Department of Alcoholic Beverage Control may prevent the plaintiffs under the guise of regulation, from carrying on a proposed business which plaintiffs claim is protected by the Commerce and the Export-Import Clauses of the United States constitution.

## PLAINTIFFS' PROPOSED OPERATIONS

The plaintiffs are two California corporations which have worked out a method of doing business, consisting of handling of liquor "in bond" and exporting it to Mexico. They have leased premises in San Ysidro at the border near San Diego and in Calexico, at the border in Imperial County. They have made improvements on the property and obtained the various permits from the federal government; have purchased trucks and are ready to commence business. They have filed bonds with the appropriate United States agencies in the principal amount of $15,000 for each plaintiff.

Plaintiffs' warehouses are located approximately one mile from the international border between California and Mexico. Each bonded warehouse consists of a bonded storage area and adjoining such bonded warehouse is a display room open to the public, used to display empty bottles of the brands stored in the bonded warehouse. Customers will not be permitted to enter the bonded warehouse area, but may enter the display room, pay for liquor and receive a receipt for the purchase. No liquor is delivered until it is exported.

All liquor handled by plaintiffs will be "in bond" for exportation out of the state of California. It will be imported into the state of California for exportation only. The liquor will be "in bond" continually until the delivery to the customer as described hereafter.

The liquor will leave bonded warehouses of manufacturers or distributors pursuant to "withdrawal entry" as provided by the Customs Service, and will be shipped to the plaintiffs at the two ports, but will be consigned in care of the Collector of Customs at the two ports. The carrier will unload the liquor from its bonded truck into its bonded warehouse, which is under government seal, and notify the Customs of the arrival of such shipment. The liquor will then be transported in bond to the bonded warehouses of plaintiffs.

By arrangements worked out with the United States Collector of Customs at San Diego, the United States Bureau of Customs will keep a U. S. Customs officer stationed at plaintiffs' respective warehouses six days a week. These officers will be employees of Customs and paid by the U. S. However, under federal law, reimbursement will be made monthly to the United States by the plaintiffs for their salaries. These Customs officers will stay within plaintiffs' bonded warehouse while the door thereto is unlocked. When not on duty, the warehouse is padlocked with two locks, one of Customs and one of plaintiffs'. A Customs officer will be present to permit withdrawal in bond from the warehouse and will keep a running inventory of the liquor stored at all times.

The procedure of exportation is accomplished in part by employees of the plaintiffs, each employee being bonded by the United States for the cartment of the liquor. They will personally transport the liquor delivered to them by the Customs officers at the plaintiffs' warehouses to the U. S. Customs Export official station at the international boundary between the state of California and the Republic of Mexico. This Customs Export officer will supervise the exportation of the liquor into Mexico and in turn certify that such liquor has been exported from the United States into Mexico.

At the boundary between California and Mexico there is a 60 foot wide strip declared by the President to be a public reservation as a protection against smuggling. All liquors sold by plaintiffs will be delivered to the office of the U. S. Bureau of Customs located within such strip and the export officer stationed

there will see to it that the liquor is exported and will so certify. The state of California and the United States have concurrent jurisdiction over the 60 foot strip.

In order to withdraw liquor from the warehouse of the plaintiffs' for export, five copies of appropriate documents which have been approved by U. S. Customs will be filed by plaintiffs' employees with the Customs officer stationed at the warehouse. Thus Customs officer then removes the liquor from the warehouse and places it in a sealed container with two copies of the documents stapled thereto. Each bottle of liquor will bear a sticker, "For export use and consumption outside the Continental Limits of the United States."

Plaintiffs' bonded cartment employees will then take the liquor and documents via the bonded truck owned by plaintiffs to the Export Office of the U. S. Customs located at the border and within the 60 foot strip. The liquor is then delivered to the customer as he departs from the 60 foot strip into Mexico and the U. S. Export Officer certifies that the liquor has been exported.

The actual sales procedure is as follows:

The customer goes to the public display and pays for the liquor he desires to have exported to Mexico. He is told to meet the bonded employee of the plaintiffs at the U. S. Customs office in the 60 foot strip, and a time for the meeting is arranged. The withdrawal papers are prepared and one copy goes to the customer.

In exporting goods other than liquor from the United States to Mexico, they often arrive in truck loads and the truck is parked for convenience somewhere within the 60 foot strip. When the papers have been checked and cleared, the truck is then permitted to cross the border and the Customs Export Officer certifies that the exportation has been accomplished. In the case of the liquor involved in the present operation, it is handed to the customer moments before he departs across the border. We do not think it significant as to whether this distance from the border is 50 feet or 5 inches. A Customs House could be constructed so that a doorway entered at the border and the customer could be handed the liquor as he goes through the doorway. We think it no different that a customer is handed the liquor some measureable feet and some moments in time before he crosses the border so long as his exit across the border and the exportation of the liquor is supervised and certified to by the U. S. Customs Export Officer.

The above procedures for exporting liquor have been approved by the U. S. Bureau of Customs in Washington and is currently followed at various border crossing points in the states of Texas and Arizona.

Thus, the liquor is continually in bond until the delivery to the customer at the border.

We find that the customer receives *custody* of the liquor moments before crossing the border, but that the *possession* of the liquor in a legal sense is in the U. S. Customs Export Officer until the moment the liquor crosses the international boundary. The legal possession is in the Export Officer, since he has allowed the custody of the liquor to the customer for the sole purpose of crossing the border. If he does not cross the border, the custody may be taken from the customer.

Under these facts, we conclude that there is no complete and full delivery to the customer until the moment that he crosses the border; up to that moment he merely has physical custody of the liquor under the control and possession of the U. S. Customs Export Officer.

### JUSTICIABLE CONTROVERSY

■ The law requires that there be more than a suppositious or fictitious case to constitute a justiciable controversy. Here, however, plaintiffs have entered written leases for the conduct of their business, and have expended substantial sums of money. They have worked out completely with the U. S.

Customs, the method of procedure for handling their "in bond" business. They are now ready to proceed except for the threats of the State to exercise civil and criminal sanctions if plaintiffs proceed.

The complaint alleges that if plaintiffs proceed with their "in bond" business as outlined in their complaint, that the Department of Alcoholic Beverage Control will proceed with the application of criminal and civil sanctions and will make seizures of liquors and vehicles.

These allegations are admitted by the answer and the admissions summarized in the pretrial order. At argument the State's attorneys conceded that in their opinion a justiciable controversy existed.

We think plaintiffs have shown enough to bring the matter properly before a court. Plaintiffs need not proceed further and encounter seizures and civil and criminal sanctions before seeking relief in court. We hold that a justiciable controversy exists.

### JURISDICTION

Plaintiffs rest jurisdiction upon 28 U.S.C.A. § 1331, a matter in controversy exceeding $10,000, and arising under the Constitution or laws of the United States; and upon 28 U.S.C.A. § 1337, an action arising under any act of Congress regulating commerce.

#### Jurisdictional Amount

■ The complaint contains a formal allegation that the amount in controversy exceeds $10,000, exclusive of costs and interest. Such a formal allegation is sufficient, unless the complaint contains others which qualify or detract from it in such measure that when all are considered together it cannot fairly be said that jurisdiction appears on the face of the complaint, in which case the suit should be dismissed. KVOS, Inc., v. Associated Press, (1936) 299 U.S. 269, 57 S.Ct. 197, 81 L.Ed. 183.

The defendant in its brief argues that as the jurisdictional facts have been challenged the formal allegation is no longer sufficient, and since the complaint does not plead in particularity the facts supporting the allegation, the action must be dismissed. This is not the law.

■ True, the plaintiffs must now bear the burden of proof of showing with particularity the presence of the required amount, but this showing need not be made by the complaint alone. Nothing in the complaint detracts from or qualifies the jurisdictional claim so as to show that jurisdiction is lacking, and the plaintiffs are free to prove their claim by the production of evidence. This they have done.

In an effort to keep out the evidence of value adduced by the plaintiffs, the defendant moved to strike the testimony of the witness Ward, relying on McNutt v. General Motors Acceptance Corp., (1936) 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135. That case lays down the rule that the value of a right interfered with by regulation is measured by the value of the business unregulated less the value of the business regulated. The difference in these values must equal $10,000 or more.

However, the McNutt rule was amplified in Gibbs v. Buck, (1939) 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111, wherein the Supreme Court held that the jurisdictional amount is measured by the value of the right to conduct business free of the *prohibition* of a statute. It found that the trial court had properly admitted into evidence facts concerning the number of contracts the plaintiff had entered into, the amounts which had been collected under those contracts, and the amounts expected in the future. On the basis of such facts, the court determined jurisdiction to be present.

■ The facts in this case are similar to those in Gibbs v. Buck, supra, as the effect of California's liquor laws is to prohibit the plaintiffs from engaging in business. The value of the proscribed right in this case is measured by the value of plaintiffs' business, since this is the amount they will lose if defendant is successful.

The plaintiffs' witness Ward testified that a willing purchaser would pay $80,-

000 and $20,000 respectively, for the two businesses. These valuations were supported by the testimony that there is now a contract under which a third party has agreed to pay $50,000 for one half of Ward's stock in the two corporations, when they commence operations. The testimony respecting the expected profits to be made, based on similar operations elsewhere on the United States-Mexico border, was uncontradicted.

■ A finding of amount in controversy can be based upon future or contingent damages, so long as there is a probability, not a possibility of future harm. Food Fair Stores v. Food Fair, (1 Cir. 1949) 177 F.2d 177; Friedman v. International Assoc. of Machinists, (1955) 95 U.S.App. 128, 220 F.2d 808.

■ The plaintiff having demonstrated both present and future value of their invaded rights to do business to be in excess of $10,000, the monetary jurisdictional requirement is satisfied.

(a) 28 U.S.C. § 1331

■ A substantial federal question exists. This was inferentially held in Idlewild Bon Voyage Liquor Corp. v. Epstein, (1962) 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794 and in the decision of the 3-judge court when the case was returned for hearing, Idlewild Bon-Voyage Liquor Corp. v. Epstein, (D.C., 1962) 212 F.Supp. 376. A late case involving a somewhat related problem is American Travelers Club Inc., v. Hostetter, (S.D.N.Y.1963) 219 F.Supp. 95. There the court also found a substantial federal question and jurisdiction. (219 F.Supp. p. 101).

(b) 28 U.S.C.A. § 1337

■ This section requires no jurisdictional amount. We think as hereafter shown that the controversy concerns the laws relating to interstate and foreign commerce. We hold we have jurisdiction under 28 U.S.C.A. § 1337.

### THE STATE LICENSING PROVISIONS

Plaintiffs' proposed business involves both importation and exportation. Of the licenses discussed below only an Importer's License and a Custom Broker's License authorizes both importation and exportation.

None of the state's licensing provisions fit the proposed operation of the plaintiffs. References below are to sections of the Alcoholic Beverage Control Act of California contained in the Business and Professional Code.

Under Sec. 23355 only the rights and privileges specified in a license *"and no others"* may be exercised.

Defendants contend plaintiffs could secure an off-sale license. Section 23394 provides for an off-sale general license. Neither importation or exportation is authorized.

Section 23402 provides a Retailer may purchase for resale only from a person holding a beer manufacturer's, wine grower's, rectifier's, brandy manufacturer's or wholesaler's license.

Section 23109 provides liquor in continual transit through the state is exempt but only while in the possession or custody of common carrier. This section is not broad enough to cover an "in bond" situation where the liquor may be stored in a government bonded warehouse.

*Manufacturer's Agents License*

Sec. 23366 limits the "sale or delivery of distilled spirits only to holders of distilled spirits manufacturer's, rectifier's, or distilled spirits wholesaler's licenses."

It authorizes the exportation of distilled spirits. But obviously plaintiffs are not manufacturer's agents. Moreover the license does not authorize *importing*, a part of plaintiff's business.

Defendants at argument and in their briefs claimed plaintiffs should secure an Importer's, a Wholesaler's or a Custom Broker's license. None of these will permit plaintiffs to operate their proposed business.

#### (a) *Importer's License*

Section 23374 authorizes the holder of an importer's license to export.

Section 23775 requires the licensed importer to *also* hold a license authorizing *sale for resale*. The licenses which authorize sale for resale are:—

 Sec. 23356 Manufacturer's License
 Sec. 23368 Rectifier's License
 Sec. 23779 Wholesaler's License

Of these only the Wholesaler's license remotely concerns plaintiffs' proposed activities. Sec. 23779 of the Act, requires such licensee to carry on a bona fide wholesale business by sale to *retail licensees*.

### (b) *Wholesaler's License*

Section 23378 authorizes a wholesaler to export but limits sales to persons holding licenses for *sale* of alcoholic beverages.

Section 23387 authorizes a wholesaler to sell to persons who take delivery within the state for delivery or use without the state within 90 days from the date of the sale.

But Section 23779 (referred to above under Importers) requires the licensee to carry on a bona fide wholesale business by sale to *retail licensees*. This plaintiffs do not propose to do and thus, although a wholesaler may export, plaintiffs could not obtain or hold a wholesaler's license.

### (c) *Custom Broker's License*

Section 23376 authorizes such a license. The licensee "may transfer to licensed importers" liquor brought into the state in bond. It also authorizes export. But Section 23019 requires the licensee to act for others and not for himself.

Moreover, in an application for the license the A.B.C. ruled that plaintiffs operations would not constitute them bona fide customs brokers.

The question was asked of counsel for the state on argument—"Suppose there is no one of these licenses that covers the particular type of business. Then what is the position of the state of California? They can't do business?" MR. DEERING (for the defendants) "That is right. The state of California cannot, and in my judgment does not have to set up laws which will cover every con-ceivable situation that a plaintiff can think of." (Tr. 251). The net result is that no licensing provisions of the present state act cover plaintiffs' operations. Defendants would therefore bar plaintiffs from this business by enforcing the various sanctions of the State act.

## THE APPLICATION OF THE DOCTRINE OF ABSTENTION

As in the 3-judge case of Idlewild Bon-Voyage Liquor Corp., v. Epstein, (S.D. N.Y.1962) 212 F.Supp. 376, there is, to say the least, great doubt as to whether the Alcoholic Beverage Control Act of California is applicable to plaintiffs' proposed operations. (212 F.Supp. p. 379). It is likewise probable that the California State Legislature in adopting the statute did not contemplate such a business as plaintiffs propose to operate. (212 F. Supp. p. 379).

Likewise it seems reasonably certain the California courts would reject as unlawful defendants' attempts to prevent plaintiffs' business. (212 F.Supp. p. 379).

■ Finally, National Distillers Products Corp. v. City and County of San Francisco, (1956) 141 Cal.App.2d 651, 297 P.2d 61, cert. den. 352 U.S. 928, 77 S.Ct. 227, 1 L.Ed.2d 163 which in turn relied heavily and almost entirely on McGoldrick v. Gulf Oil Corp., (1940) 309 U.S. 414, 60 S.Ct. 664, 84 L.Ed. 840, demonstrates what California courts would do with the problem. McGoldrick involved a tax on oil and National Distillers a tax on liquor. In our case the State claims to be attempting *regulation*, not the imposition of a tax. In each case above the tax was held invalid as an infringement of the Congressional regulation of commerce. The oil and the liquor were in the stream of interstate commerce; therefore the State could not tax. Likewise, the State by purported regulation may not prohibit a business whose activities are protected under the Commerce clause.

■ We agree with Idlewild that the doctrine of abstention should not apply and that we should decide the constitu-

tional problem here presented. (212 F. Supp. pp. 380–381).

## THE COMMERCE CLAUSE AND THE EXPORT AND IMPORT CLAUSE

Article I, Section 8, Clause 3 of the United States Constitution provides that Congress shall have the power "to regulate Commerce with foreign Nations, and among the several States and with Indian Tribes."

Article I, Section 10, Clause 2 provides "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws * * * ".

Pursuant to the Commerce Clause the Congress enacted Section 311 of the Tariff Act of 1930 [19 U.S.C.A. § 1311] providing for bonded manufacturing warehouses and particularly providing that no Internal Revenue tax shall be imposed on distilled spirits and wine rectified in warehouses, provided that such distilled spirits and wine are exported or shipped in accordance with the section.

The present Chapter 51 of the Internal Revenue Code of 1954 enacted September 2, 1958, 72 Stat. 1313 contains sections (now in 26 U.S.C.A.) which deal with bonded liquors. These are sections 5212, Transfer of Distilled spirits from bonded premises free of tax or without payment of tax; 5221, Commencement, suspension and resumption of operations; 5222, Production, receipts, removal and use of distilling materials; 5223, Redistillation of spirits.

Regulations of the U. S. Treasury Department, Bureau of Customs, have been promulgated under the Tariff Act. They appear in 19 C.F.R. parts 8, 12, 18, 19, 21, 23 and 25.

■ The power of Congress over exports and imports is supreme. Generally States may not interfere with this function while the goods are in the course of foreign commerce. Texas & New Orleans Railroad Company v. Sabine

Tram Company, (1913) 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442.

We next turn to the effect of the 21st Amendment which in Sec. 2 clearly states, "The transportation or importation into any State * * * of the United States *for delivery or use therein* of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." (Emphasis added).

The cases involving the interaction and interpretation of the Commerce clause and the 21st Amendment have defined three areas concerning state power;—

(1) Importation for "Delivery or use" within the State.

(2) Shipments through or across States into areas of federal jurisdiction lying within a state.

(3) Shipments of liquor crossing a State destined for another State or a foreign country.

We summarize the cases:

(1) *Importation for "Delivery or Use" within the State.*

Here the State, because of the 21st Amendment could levy a license fee or tax. State Board of Equalization of. Calif. v. Young's Market Company, (1936) 299 U.S. 59, 57 S.Ct. 77, 81 L.Ed. 38, or forbid the importation Joseph S. Finch & Co. v. McKittrick, (1939) 305 U.S. 395, 59 S.Ct. 256, 83 L.Ed. 246.

■ But these powers to be exercised by States under the 21st Amendment did not preempt the field or prevent the Federal government from entering the field.

In United States v. Frankfort Distilleries, (1945) 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951, the court held that notwithstanding the powers given States under the 21st Amendment, such powers did not overrule the federal Anti-Trust statutes.

Thus, although States could regulate, license, or tax, or prohibit entirely the *delivery or use of liquor within its boundary,* the Commerce clause and statute affecting interstate or foreign commerce were unaffected.

(2) *Shipments of liquor through or across States into areas of federal jurisdiction lying wholly within a state.*

In Collins v. Yosemite Park & Curry Company, (1938) 304 U.S. 518, 58 S.Ct. 1009, 82 L.Ed. 1502, California was held without power to license or regulate liquor shipments into Yosemite, a federal Park, lying wholly within California. In Johnson v. Yellow Cab Transit Company, (1944) 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814 the court held that the state seizure of liquor being shipped across Oklahoma, a dry state, into Fort Sill, a federal reservation within Oklahoma, was an unlawful interference with interstate commerce.

(3) *Shipments of liquor crossing a State destined for another State or foreign country.*

Ziffrin Inc., v. Reeves, (1939) 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128, was one of the later cases which raised the question of how far a State could go in regulating interstate shipments. There appears strong language indicating the court would permit a state to have free rein in its regulation of this type of interstate commerce, but the court pointed out that the conditions imposed by Kentucky "are not unreasonable and are clearly appropriate for effectuating the policy of limiting traffic in order to minimize well-known evils and secure payment of revenue."

In Duckworth v. Arkansas, (1941) 314 U.S. 390, 62 S.Ct. 311, 86 L.Ed. 294, where Arkansas required a carrier of liquor to secure a State permit, the court held that the 21st Amendment did not govern, since there was no sale or use within the state. The court held the requiring of a permit was within the reasonable police power of the state's regulatory authority. The court said:

"The Arkansas statute does not conflict with any act of Congress. *It does not forbid or preclude the transportation,* or interfere with the free flow of commerce among the states beyond what is reasonably necessary to protect the local public interest in preventing unlawful distribution or use of liquor within the state. It does not violate the commerce clause. Cf. Ziffrin, Inc. v. Reeves, 308 U.S. 132 [60 S.Ct. 163, 84 L.Ed. 128]." (Emphasis added)

In Carter v. Commonwealth of Virginia, (1944) 321 U.S. 131, 64 S.Ct. 464, 88 L.Ed. 605, it was argued that the 21st Amendment gave Virginia no power to prohibit absolutely a shipment from Maryland across Virginia into North Carolina, and that Virginia's power to regulate was limited by the Commerce Clause to reasonable regulation.

"Whatever may be the effect of the Twenty-first Amendment, this record presents no problem that may not be resolved under the Commerce Clause alone. That Clause remains in the Constitution as a grant of power to Congress to control commerce and as a diminution pro tanto of absolute state sovereignty over the same subject matter. The Twenty-first Amendment limits that grant of power as to intoxicating liquor by prohibiting 'transportation or importation into any State, Territory, or possession of the United States *for delivery or use therein* * * * in violation of the laws thereof.' By interpretation of this Court the amendment has been held to relieve the states of the limitations of the Commerce Clause on their powers over such transportation or importation. It has also been held that shipment through a state is not transportation or importation into the state within the meaning of the Amendment. Collins v. Yosemite Park Co., 304 U.S. 518, 535, 538 [58 S.Ct. 1009, 1017, 1018, 82 L.Ed. 1502]." (Emphasis added).

In Gordon v. Texas, (1958) 355 U.S. 369, 78 S.Ct. 363, 2 L.Ed.2d 352, the defendant enroute to his home in No. Carolina from Mexico, entered Texas with two gallons of Mexican rum. Defendant's conviction for possession of illicit liquor without payment of the

Texas tax was affirmed by the Supreme Court in a per curiam decision citing the 21st Amendment and Carter v. Commonwealth of Virginia, supra.

These cases illustrate that California could legally *regulate* plaintiffs' proposed operations to the extent that no undue burden was placed on interstate or foreign commerce but not prohibit them. The State has impliedly admitted that if the Alcoholic Beverage Control Act of California is applied, it will prohibit plaintiffs' operations.

### Goods in Bond are protected by the Commerce Clause

McGoldrick v. Gulf Oil Corp., supra, (309 U.S. 414, 60 S.Ct. 664, 84 L.Ed. 840) teaches the goods "in bond" do not become a part of the common mass of property in a State. It involved the importation of crude oil "in bond," and with arrival of it for export or lawful purpose free of the import duty which would otherwise be payable. The Comptroller of New York sought to tax the sale of fuel oil thus manufactured. The court said:

"For present purposes we may assume, without deciding, that had the crude oil not been imported in bond it would, upon its manufacture, have become a part of the common mass of property in the state and so would have lost its distinctive character as an import and its constitutional immunity as such from state taxation." (citing cases).

"From the time of importation until the moment when the bunker 'C' oil is laden on vessels engaged in foreign trade, the imported petroleum and its product, the fuel oil, is segregated from the common mass of goods and property within the state, and is subject to the supervision and control of federal customs officers."

" * * * It is evident that the purpose of the Congressional regulation of the commerce would fail if the state were free at any stage of the transaction to impose a tax which would lessen the competitive advantage conferred on the importer by Congress, and which might equal or exceed the remitted import duty. See, People [of State of New York] v. Compagnie Generale Transatlantique, 107 U.S. 59, 63 [2 S.Ct. 87, 90, 27 L.Ed. 383]. The Congressional regulation, read in the light of its purpose, is tantamount to a declaration that in order to accomplish constitutionally permissible ends, the imported merchandise shall not become a part of the common mass of taxable property within the state, pending its disposition as ships' stores and shall not become subject to the state taxing power. The customs regulation prescribing the exemption from state taxation, when applied to the facts of the present case, states only what is implicit in the Congressional regulation of commerce presently involved. The state tax in the circumstances must fail as an infringement of the Congressional regulation of the commerce."

National Distillers Products Corp. v. City and County of San Francisco, (supra) (141 Cal.App.2d 651, 297 P.2d 61) was a case involving liquor in foreign commerce and the attempt of the State of California to tax it. The court relied almost wholly upon McGoldrick, supra, and struck down the tax.

In our case the goods are "in bond" or under control of U. S. Customs until the movement of export. They never become part of the common mass of goods in the State.

### THE IDLEWILD BON VOYAGE CASE

Idlewild Bon-Voyage Liquor Corporation v. Epstein, (S.D.N.Y.1962) 212 F. Supp. 376, a decision by a statutory 3-judge court deciding a like problem, is dispositive of our case.

Under the name of Idlewild Bon-Voyage Liquor Corporation v. Rohan, et al., (S.D.N.Y.1960) 188 F.Supp. 434, the district court relying upon the doctrine of abstention, refused to convene a 3-judge court. The case was appealed and under

the same name in 289 F.2d 426, (1961) the court of appeals of the Second Circuit held that the single judge district court had no jurisdiction to refuse the request for a 3-judge court under the facts, but that the court of appeals lacked jurisdiction to determine the matter on appeal.

The case went to the Supreme Court on grant of certiorari in 368 U.S. 812, 82 S.Ct. 88, 7 L.Ed.2d 21 and in Idlewild Bon Voyage Liquor Corporation v. Epstein, (1962) 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794, the court held that a 3-judge court should have been convened by the single district judge court, but that the court of appeals was not powerless and that in substance, its judgment was reversed and the case remanded to the district court for action consistent with the views expressed.

The 3-judge court was assembled and in Idlewild Bon-Voyage Liquor Corporation v. Epstein et al., (S.D.N.Y.1962) 212 F.Supp. 376, the court ruled that the plaintiff was entitled to relief in its application for injunction against the members of the Liquor Authority of the State of New York. Notice of appeal was filed March 13, 1963, and the record certified to the Supreme Court on May 6, 1963.

The appeal is pending. On October 14th, the Supreme court under No. 116 of the current calendar noted jurisdiction under the name Hostetter v. Idlewild Bon-Voyage Liquor Corp., 375 U.S. 809, 84 S.Ct. 43, 11 L.Ed.2d 46. According to Law Week [32 L.W. 3126] the questions presented are:

1. Does the Commerce Clause prevent New York from terminating the business of any licensable dealer who sells liquor for export to departing passengers at N. Y. International Airport?

2. Does the Twenty-first Amendment subject such dealers' operations to N. Y. Liquor control laws?

Factually the case varies only in one respect from the case before us. In our case the liquor is handed to the purchaser by a Customs Agent at the time he crosses the border into Mexico. We have *found* that although the purchaser has physical custody of the liquor for the few moments until he crosses the border, and the liquor is at all times under the supervision of the Customs Agent.

And we have *concluded* that the purchaser has only the physical custody of the liquor and that the legal possession of the liquor remains in the Customs agent until the moment the purchaser crosses the border.

In the case before the 3-judge court [212 F.Supp. 376] "The [liquor] is delivered aboard the departing aircraft on documents approved by United States Customs, with instructions to the air line to deliver to the passenger purchaser only upon arrival at the foreign destination."

We hold that the factual distinction between the two cases is a distinction without a difference.

In the Idlewild case, the passenger receives the liquor upon arrival at the foreign destination. In our case, he receives it the moment before he crosses the border under the supervision of a Customs agent who supervises his departure and the exportation of the liquor from the United States into Mexico, and certifies to its exportation.

The recent 3-judge case of American Travelers Club Inc., v. Hostetter, (S.D. N.Y. 6/24/63) 219 F.Supp. 95, does not require a different result. There the situation was reversed, in that liquor was being brought into the United States. Customers purchased liquor abroad and declared it upon arrival from foreign service as duty free "liquor to follow." The problem did not involve liquors which the tourist carried with him on return from abroad. The court denied injunctive relief on the ground that "[T]he very heart of plaintiffs' liquor operation falls within the coverage of the New York statute and that it is subject to requirements of regulation and licensing." (219 F.Supp. p. 105).

The court finds no provisions in the Customs statute "purporting to create an affirmative federal 'right' to import into a state a quantity of liquor in violation of a state's liquor laws." (219 F.Supp. p. 106).

The court distinguishes the case from Idlewild Bon-Voyage Liquor Corp. v. Epstein, supra, (212 F.Supp. 376) on the ground that in such case there was no delivery or use until arrival at the foreign destination, and because the Twenty-first Amendment did not apply "because there was no 'delivery or use' within New York, and close Customs inspection reduced to 'minimal' proportions the possibility of diversion within the State. The State action was struck down as a violation of the Commerce Clause because New York had not sought to 'regulate or supervise,' but to 'terminate,' and this attempted prohibition was not found to be 'reasonably necessary to protect the local public interest in preventing unlawful distribution or use of liquor within the state.'"

The case is helpful however, in that the court holds that there was jurisdiction of a substantial federal question under 28 U.S.C. 1331 and that the "extent of the injury to plaintiffs' business satisfies the amount in controversy requirement of 28 U.S.C. § 1331." (ft. note 6).

The court also found that the 3-judge court was proper under 28 U.S.C. §§ 2281 and 2284. (219 F.Supp. p. 102).

### CONCLUSION

We read the cases as holding that a State may reasonably *regulate* interstate or foreign shipments of liquor for good cause, and that where such regulations are reasonable the burden placed on interstate commerce will not require the State regulation to be struck down. Conversely however, a State may not *prohibit* such interstate or foreign shipments.

 "The action threatened against plaintiff is his elimination from the business in which he engages." Idlewild Bon-Voyage Liquor Corp. v. Epstein, supra, 212 F.Supp. 376 at 383 * * * The case before us does not, therefore involve reasonable measures aimed at preventing unlawful diversion or use of alcoholic beverages within [California]. The Liquor Authority does not seek to use the power of [California] to regulate or supervise. It seeks to terminate. This it cannot constitutionally do. (Paraphrasing Idlewild Bon-Voyage Liquor Corp. v. Epstein, supra, 212 F.Supp. 376 at 386).

We would prefer to await the decision in the Idlewild case in the Supreme Court but the case must be decided.

Accordingly the plaintiffs shall have injunctive relief against the defendants as prayed.

The proposed judgment or decree submitted by the defendants will be modified to provide that the injunction is limited to activities of the State in enforcing the Alcoholic Beverage Control statutes as they now exist. If the State of California sees fit to pass statutes and regulations directed towards reasonable regulation of plaintiffs' business, this will be another case for another day.