Louis J. EPSTEIN and Julius Epstein t/a Stratford International Tobacco Co., Plaintiffs,

v.

Joseph P. LORDI, Director of the Division of Alcoholic Beverage Control of the Department of Law and Public Safety of New Jersey, Defendant.

Civ. No. 383–65.

United States District Court
D. New Jersey.

Dec. 14, 1966.

Max Mehler and Harold Fisher, Newark, N. J., for plaintiffs.

Joseph A. Hoffman, Deputy Atty. Gen. of New Jersey, for defendant.

OPINION

Before SMITH, Circuit Judge, and LANE and COOLAHAN, District Judges.

COOLAHAN, District Judge:

I.

The plaintiffs bring this action pursuant to Sections 2281 and 2284 of Title 28, U.S.C. to enjoin the enforcement against their business of certain provisions of the New Jersey Alcoholic Beverage Law, N.J.S.A. 33:1-1 to 33:1-96. As the basis for an injunction, the complaint seeks a declaration that the state statute, as applied, is repugnant to the Commerce, Export-Import, and Supremacy clauses of the United States Constitution. General jurisdiction is founded upon 28 U.S.C. § 1331, a matter in controversy exceeding $10,000.00, and arising under the Constitution or laws of the United States.

The concrete question posed is whether New Jersey can require the plaintiffs to obtain a wholesale liquor license before they engage in the sale of in bond tax free liquor to vessels docked in New Jersey, where such liquor is sold for use in foreign commerce.

The portion of the New Jersey Alcoholic Beverage Law in question is N.J. S.A. 33:1-11 which requires a state issued license for the conduct of wholesale liquor operations in New Jersey.[1] At first, plaintiffs sought such a wholesale license from the appropriate state administrative authorities, but they rejected the wholesale license ultimately proffered because it was restricted. Now they contend that New Jersey can only require them to obtain a transportation

---

1. N.J.S.A. 33:1-11, insofar as pertinent, provides as follows:

"Class B licenses; subdivisions; fees

"Class B licenses shall be subdivided and classified as follows:

"Plenary Wholesale license. 1. The holder of this license shall be entitled, subject to rules and regulations, to sell and distribute alcoholic beverages to retailers and wholesalers licensed in accordance with this chapter, and to sell and distribute without this State to any persons pursuant to the laws of the places of such sale and distribution, and to maintain a warehouse and sales-room; provided, however, that the delivery of such alcoholic beverages by the holder of this license to retailers licensed under this Title shall be from inventory in a warehouse located in New Jersey which is operated under a plenary wholesale license. The fee for this license shall be $3,000.00."

The license fee is an annual expense. The remaining subdivisions of § 33:1-11 provide for limited licenses authorizing sale and distribution of wines and/or brewed malt beverages and are not in issue.

license,[2] and that requiring a wholesale license is unconstitutional.

The pertinent facts have been stipulated by the parties; the remaining determinations are issues of law. Plaintiffs conduct their business as a partnership under the name Stratford International Tobacco Co. [Stratford] from 504 Clinton Avenue, Newark, New Jersey, which premises are not licensed by the State.

Stratford's operations are carried on pursuant to Federal importer's and exporter's basic permits which authorize it to import in-bond liquor into the United States and to sell, deliver and ship such liquor in interstate and foreign commerce. Stratford also holds a license and its drivers are bonded and hold identification cards, all issued by the Bureau of Customs, which authorize its drivers to transport in-bond liquor in Stratford's trucks.

Liquor imported by Stratford enters the Port of New York or the Port of New Jersey [a division of the Port of New York area], where it is consigned to the custody and care of the Collector of Customs. In addition to importing liquors from abroad, Stratford also purchases in bond liquor from bonded distilleries in the United States, which is delivered by bonded carrier into bonded warehouses in New Jersey.

All the liquor, whether imported or domestic, is brought into New Jersey by Stratford solely for export. As such, the liquor is constantly subject to the control and custody of the United States Treasury Department, Bureau of Customs or Bureau of Internal Revenue, from the moment of entry into the state until its ultimate release for consumption in foreign commerce. The control is effected through a comprehensive scheme of regulation and inspection procedure pursuant to Sections 309, 311 and 317 of the Tariff Act of 1930, as amended, 19 U.S.C. §§ 1309, 1311 and 1317, related portions of the Internal Revenue Code, as amended, 26 U.S.C. §§ 5012, 5062 and Treasury Regulations promulgated by the Bureau of Customs, 19 C.F.R. parts 8, 12, 18, 19, 21, 23 and 25.[3]

On the basis of these facts, the plaintiffs now contend that the wholesale licensing provision of N.J.S.A. § 33:1-11 is inapplicable to their enterprise and that they are not licensable under it. In the alternative they argue that if Sec-

2. "33:1-13 Class D licenses: transportation license; fee
   "Class D licenses shall be as follows:
   "Transportation license. The holder of this license shall be entitled, subject to rules and regulations, to transport alcoholic beverages into, out of, through and within the state of New Jersey and to maintain a warehouse. The fee for this license shall be two hundred dollars."

3. The constitutional significance of this regulatory scheme is discussed infra., p. 936. Here we note only the procedures it requires. Upon arrival of the imported liquor consigned to the Collector of Customs, Stratford receives a notice of arrival, bills of lading, and various certificates. The liquor is then carried to a United States Customs bonded warehouse in a bonded truck owned by Stratford, or by a bonded common carrier and, in either event, a vehicle licensed by the Customs for such carriage. The warehouse itself is under the jurisdiction and control of the Federal Government.
   Once stored, the liquor may only be withdrawn and delivered pursuant to an equally rigorous policing system. Sales orders are solicited by phone, by mail or in person either at shipping line offices or directly from ship officers at dockside. To withdraw ordered liquor, Stratford obtains a permit with several copies from the Customs office in Newark. The copies are delivered to the customs inspector at the warehouse. He retains a copy and gives two others to the bonded carrier which delivers the liquor in its original package to shipside. At shipside, a second customs inspector makes sure that the liquor is placed on board the ship and sealed; he then sends a copy of the withdrawal permit, properly noted, back to the Customs authorities.
   By virtue of these operations, the liquor is legally in bond continuously from the moment of its entry into New Jersey until the delivery on board for Stratford's customer. Moreover, under federal law, such liquor may not be removed from its package nor consumed until the ship is beyond the territorial waters of the United States.

tion 33:1–11 is construed to require a wholesale license for their enterprise, it is unconstitutional.

New Jersey's position throughout this controversy has been threefold; that Stratford's operation is licensable under Section 33:1–11; that plaintiffs cannot solicit, sell and deliver in bond liquor in the manner described without first obtaining a Class B plenary wholesale license; and that this requirement is constitutional.

Plaintiffs' present contentions differ substantially from their position in the State courts. A brief review of the prior proceedings is necessary to fully understand the nature of this variance.

## II.

About four years ago the plaintiffs, who had been tobacco merchants for many years, expanded their operation to include the sale of tax free tobacco to ships in the Port of New York. However, they soon ascertained that this business is precarious unless they also sell tax free in bond liquor, since purchasing agents for the shipping companies prefer to buy both items from the same source of supply. Prior to plaintiffs' entry into the field, the firm of Marine Tobacco Co. was the exclusive supplier of tax free liquor to ships in the New Jersey Division of the Port of New York.

In the Spring of 1963, the plaintiffs applied for a Class B plenary wholesale license. Marine Tobacco Co. intervened in opposition. The Acting Director found that there was a "public need" for an additional wholesaler in this area. Re Epstein, A.B.C. Bulletin, 1565, Item 3. He tendered plaintiffs a Class B license, subject to the following special condition:

"That no sales of alcoholic beverages will be made in New Jersey except only such sales as are made in bond to steamship companies to become part of ships stores for use beyond the jurisdiction of this State."

Plaintiffs rejected this offered license and appealed the decision to the New Jersey Superior Court, Appellate Division. The plaintiffs challenged the Acting Director's statutory authority for adding the proposed restriction to the normal terms of a Class B license; they argued that since he had found a public need for an additional wholesaler, they were entitled to an unrestricted Class B license.

The Appellate Division did not reach the question of the Director's authority to supplement the statutory provisions with additional restrictions upon the license. The Court simply agreed with the Acting Director that the Epsteins had overstated his findings. Since the Acting Director had only found a public need for an additional competitor in the specific area of sales for overseas consumption, and not for another "plenary license as such", the court affirmed the denial of an unrestricted license. Epstein v. Director of Alcoholic Beverage Control, App.Div. A–98–63 (May 21, 1964), cert. denied 43 N.J. 260, 203 A.2d 714 (1964).

Thereafter, on March 6, 1964, the plaintiffs applied for a Class D liquor transportation license. It was stipulated that notwithstanding their failure to obtain a wholesale state license, they had continued to solicit and sell tax free liquor to ships docked in New Jersey.

At this point, for the first time in the State proceedings, the plaintiffs formally challenged the constitutionality of requiring a wholesale license for their business. The Director held that Stratford's solicitation and sales activity were subject to New Jersey's Alcoholic Beverage Law "within the confines of the Twenty-first Amendment as it relates to the Commerce Clause." Defendant's Brief, pg. 4.

The Director concluded that since the plaintiffs had not procured a wholesale license for their solicitation and sales of tax free liquor, they could not be granted a transportation license to transport liquor for such unlicensed activity.

The denial of a transportation license was also appealed to the New Jersey Superior Court, Appellate Division. Pend-

ing that appeal, the Director wrote the plaintiffs in February of 1965, noting that Stratford had made specific sales of the kind described above. The letter warned plaintiffs to discontinue the sale and delivery of alcoholic beverages "particularly to ships docked at New Jersey piers," and further threatened prosecution under the New Jersey Alcoholic Beverage Law which prohibits "sales" of liquor without a state license and which makes any unlicensed sale a punishable offense.[4]

The plaintiffs allege that this specific threat to their business and their personal liberty constitutes an appropriate case for a three judge court's adjudication and grant of the requested relief.

Thus, the plaintiffs now claim they are not within the purview of the licensing statute and, that in any event they cannot constitutionally be required to obtain a license; but their formal position in the State proceedings, until they applied for the transport license, was that they were entitled to such a license and sought one.

While the defendant has alluded to this change in tactics, he has presented no legal ground for denying the plaintiffs' standing to challenge the constitutionality of the licensing statute, as applied, merely because they did not choose to challenge it initially in the State Court proceedings.

Moreover, at both the original hearing on Stratford's application for a Class B wholesale license and the appeal from the denial of such a license, the plaintiffs testified that in their view no state license could be required for the sale of tax free liquor in interstate and foreign commerce in the manner they anticipated using. They indicated that the application for such a license was being made only to avoid aggravation and the expense of litigation. Re Epstein, ABC Bulletin, supra, at 5; Epstein v. Director of Alcoholic Beverage Control, App.Div. supra, Transcript, at 41.

### III.

After commencement of this lawsuit, the Chief Judge constituted this three judge Court to consider the matter in accordance with 28 U.S.C. § 2281. Invocation of Section 2281 presents two threshold questions as to whether adjudication by a three judge tribunal is appropriate.

■■■ First, if prior cases have rendered the constitutional issues moot or settled, the proper procedure is to disband the three judge court and remand the matter to the single district judge before whom it was originally brought. Where previous decisions have foreclosed the possibility that the challenged State statute can stand in the face of constitutional provisions to which it is allegedly repugnant, a three judge Court is not required. Turner v. City of Memphis, 369 U.S. 350, 353, 82 S.Ct. 805, 7 L.Ed. 2d 762 (1961); Baily v. Patterson, 369 U.S. 31, 33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1961) [past cases had established the unconstitutionality of the state laws on their face]. And see Ex parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933) [challenge to state law's constitutionality was insubstantial on its face].

■ The possibility of applying this doctrine to the case before us stems from the substantial parallels between it and the situations before the Court in Hos-

---

4. Section 33:1-2 prohibits anyone from selling alcoholic beverages in New Jersey without first obtaining a license. "Sale" is defined by Section 33:1-1 as:
   "w. 'Sale'. Every delivery of an alcoholic beverage otherwise than by purely gratuitous title, including deliveries from without this state and deliveries by any person without this state intended for shipment by carrier or otherwise into this state and brought within this state, or the solicitation or acceptance of an order for an alcoholic beverage, and including exchange, barter, traffic in, keeping and exposing for sale, serving with meals, delivering for value, peddling, possessing with an intent to sell, and the gratuitous gift or delivery of any alcoholic beverage by any licensee."
   Section 33:1-50 makes it a misdemeanor to make an unlicensed sale in violation of the above statutes.

tetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1963); and in Department of Alcoholic Bev. Control for State of California, et al v. Ammex Warehouse, 378 U.S. 124, 84 S.Ct. 1657, 12 L.Ed.2d 743 (1963). If the *Hostetter* and the *Ammex* cases on their face were dispositive of the constitutional issues, as the defendant contends, then a three judge court would be unwarranted. However, as set forth below, the operative facts in the present matter, insofar as they bear on the constitutional questions, are not completely congruent with those presented by the earlier cases. Indeed, the instant action raises questions expressly left open by the Court in the *Ammex* decision. We conclude that resort to a three judge court was proper, these prior cases notwithstanding.

▆▆▆ Nor is this lawsuit one based solely on the ground that the state statute is repugnant to the Supremacy clause because of its conflict with a federal statute. Since 28 U.S.C. § 2281 is a technical provision to be construed strictly, Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1917), suits to enjoin the enforcement of state law resting solely on "supremacy grounds" do not come within the provision for three judge courts. Swift & Co. et al v. Wickham, 382 U.S. 11, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). It is clear that both the allegations in the complaint, and this Court's decision involve substantial questions of the state statute's repugnancy to other parts of the Constitution besides the Supremacy clause.

### IV.

▆▆▆ The plaintiffs seek to question both the applicability of the wholesale licensing provision in Section 33:1–11 to their business, and the constitutionality of such a requirement if the statute is applied. This Court need not consider the first question, since it has been conclusively determined in the State court proceedings. The decision by the Appellate Division of the Superior Court, with certification denied by the New Jersey

Supreme Court, was more than a general interpretation of the statute's coverage by the primary authority on New Jersey law. In addition, it offers a determination on the precise question of whether Stratford's operation was within the purview of the licensing requirement.

Affirming the denial by the Acting Director of an unrestricted license, the Appellate Division indicated directly and implicitly that it construed Section 33:1–11 to cover plaintiffs' business. The Court directly analyzed Stratford's operation as follows:

> "The Alcoholic Beverage Control Act does not provide for a special license for the sale of tax free liquor in bond. *Such sales may be made under a plenary wholesale license* of which some seventy-five have been issued in this State." Epstein v. Lordi, supra, at 1, 2 [Emphasis supplied].

Moreover, the decision that Stratford was not entitled to an unrestricted license on the basis of the limited "public need" adduced at the hearing, necessarily assumed that Stratford at least was licensable under the challenged provision, i. e. that the section applied to Stratford's activity. Since this underlying assumption was an essential aspect of the decision, it constitutes an integral part of the Court's holding. McAlpine v. City of Garfield, 137 N.J.L. 197, 59 A.2d 3 (E. & A., 1948); Trustees of School Dist. No. 28, of Warren County v. Stocker, 42 N.J.L. 115 (Sup.Ct. 1880); 50 C.J.S. Judgments § 723.

Thus, both as a matter of New Jersey's interpretation of its own statutes, and as a matter of collateral estoppel, the plaintiffs are foreclosed from challenging the application of Section 33:1–11 to their business. And, the Appellate Division's conclusion removes the issue of abstention raised in the *Hostetter* case. See Idlewild Bon Voyage Liquor Corp. v. Epstein, D.C., 212 F.Supp. 376, 377 (1962).

### V.

We turn to the plaintiffs' contention that the wholesale licensing statute, as

applied to their business, violates the Commerce Clause. Their claim revives a recurring confrontation of State and Federal powers: the conflict between State regulation of liquor under the Tenth or the Twenty-first Amendments, and the limitations imposed upon the States by the constitutional grant to Congress of power over foreign and interstate commerce.[5]

■■ Apart from the Twenty-first Amendment, New Jersey's authority to regulate liquor stems from its traditional "police power" to regulate activities within its borders for the protection of its citizens; the wholesale license requirement must either be a valid exercise of this police power or, alternatively, come within the ambit of the additional powers conferred by the Amendment.

■■ The potential evils of intoxicants and the difficulties of keeping them within legal bounds have long been recognized as warranting broad exercise of State authority within the traditional confines of the Commerce Clause. Leisy v. Hardin, 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128 (1890) and cases cited. The Constitution "has never been deemed to exclude the states from regulating matters primarily of local concern with respect to which Congress has not exercised its power, even though the regulation has some effect on interstate commerce." Duckworth v. State of Arkansas, 314 U.S. 390, 394, 62 S.Ct. 311, 313, 86 L.Ed. 294 (1941). The injurious possibilities associated with liquor may justify even more extensive regulation than commerce in less dangerous products. Id. at 396, 62 S.Ct. 311.

■ On the other hand, State regulation of liquor under the police power, as in other fields of commerce, is invalid if: (a) the subject demands national uniformity so that State action is precluded even absent Federal action;

(b) Congress has occupied the field to the exclusion of State regulation; or (c) a particular State statute conflicts directly with an express regulation by Congress. Cooley v. Board of Wardens, 12 How. 299, 13 L.Ed. 996 (1851); Kelly v. State of Washington, 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3 (1937).

■■ Moreover, even where some State regulation of local matters is permissible, the State may still run afoul of the free trade policy of the Commerce Clause if it discriminates against or otherwise unduly burdens interstate commerce. Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1959). In short, the regulation must be evenhanded and reasonable; unreasonable burdens on interstate commerce in liquor must fall unless validated by the Twenty-first Amendment. State Board of Equalization of California v. Young's Market, 299 U.S. 59, 57 S.Ct. 77, 81 L.Ed. 38 (1936) dictum.

■ Finally, when foreign commerce is involved the national interest is even more clearly paramount. Federal power over such commerce is closely allied to its exclusive authority in foreign relations and it is buttressed by the Export-Import Clause which prohibits State imposts or duties levied without Congressional consent. "The principle of duality in our system of government does not touch the authority of Congress in the regulation of foreign commerce." Board of Trustees of University of Illinois v. United States, 289 U.S. 48, 57, 53 S.Ct. 509, 77 L.Ed. 1025 (1932).

In marked contrast to these traditional restrictions, the Twenty-first Amendment cedes broad powers to the States by providing:

"* * * [t]he transportation or importation into any State, Territory or possession of the United States

---

5. Particularly since the enactment of the Twenty-first Amendment, the field has been marked by successive attempts to accommodate State and Federal interests as each new factual pattern demands a reappraisal of State power. See Note, The Twenty-first Amendment Versus the Interstate Commerce Clause, 55 Yale L.J. 815 (1946); Note, The Evolving Scope of State Power Under the Twenty-first Amendment, 19 Rutgers L.Rev. 759 (1965).

for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

■ Under the Amendment, New Jersey may prohibit completely the manufacture of liquor within its borders and may prohibit or condition the export of such liquor from the State. Ziffrin, Inc. v. Reeves, 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128 (1939). It also has the power to prohibit or to condition in the most discriminatory fashion the importation into its territory of all intoxicants "for delivery or use" within New Jersey, as that phrase is employed in the Twenty-first Amendment. Finch & Co. v. McKittrick, 305 U.S. 395, 59 S.Ct. 256, 83 L.Ed. 246 (1939); State Board of Equalization of California v. Young's Market, supra.

■ Where, however, the liquor is not brought into the State for "delivery or use therein", regulation cannot be predicated upon the Amendment.

■ Thus, if liquor imported into New Jersey is destined for distribution and use in a Federal enclave within the State the Twenty-first Amendment does not apply. Collins v. Yosemite Park & Curry Co., 304 U.S. 518, 58 S.Ct. 1009, 82 L.Ed. 1502 (1937); Johnson v. Yellow Cab Transit Co., 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814 (1944).

In *Collins*, liquor shipments were physically transported across California's territory and into Yosemite National Park, where the liquor was sold and consumed. The Park, although within California's borders, had been ceded to the United States Government. The Court held that "There was no transportation into California 'for delivery or use therein.' The delivery and use is in the Park, and under a distinct sovereignty." 304 U.S. at 538, 58 S.Ct. at 1018.[6]

In the case of "through shipments" of liquor traversing New Jersey for delivery and use in other States, similar analysis appears to place such shipments beyond the reach of the Amendment. Carter v. Commonwealth of Virginia, 321 U.S. 131, 64 S.Ct. 464, 88 L.Ed. 605 (1943) dictum; Hostetter, supra, 377 U.S. at 331–338, 84 S.Ct. 1293 dictum; Department of Alcoholic Bev. Control etc., v. Ammex Warehouse, 224 F.Supp. 546, 554 (D.C.1963) dictum, aff'd. 378 U.S. 124, 84 S.Ct. 1657 (1963); c. f. Duckworth v. State of Arkansas, 314 U.S. 390, 62 S.Ct. 311 (1941); Gordon v. State of Texas, 355 U.S. 369, 78 S.Ct. 363, 2 L.Ed.2d 352 (1958) per curiam; and see *Note, Evolving Scope of State Power Under the Twenty-first Amendment*, supra, pp. 768–771.

The status of such "through shipments" is less clear because in the two leading cases, the Court upheld State regulation as a valid exercise of the police power, Commerce Clause challenges notwithstanding, and expressly declined to consider the applicability of the Amendment. Carter, supra, 321 U.S. at 135, 64 S.Ct. 464; Duckworth, supra, 314 U.S. at 392, 62 S.Ct. 311.[7] Moreover, concurring Justices in each decision relied upon the Twenty-first Amendment. See *Hostetter*, supra, n. 10.

6. The Court upheld California's imposition of an excise tax levied upon each unit of liquor sold since the State had reserved direct taxing rights when the Park lands were ceded to the United States. However, it is noteworthy that the imposition of "license fees" for the right to sell such liquor was struck down as an integral part of an attempted regulatory scheme which California was powerless to enforce. It was in connection with this scheme, including the license fees, that the Court considered the Twenty-first Amendment and found it inapplicable. 304 U.S. at 533, 58 S.Ct. 1009.

7. *Duckworth*, involved an Arkansas statute requiring a carrier of liquor to secure a State permit. The Court upheld a conviction for failure to obtain the permit, noting that the defendant was entitled to it merely upon application and that the nominal fee defrayed issuing and inspection costs. *Carter* sustained state regulations of through liquor shipments which required (1) that the most direct route be taken and that the route be described on the bills of lading, (2) listing of the actual consignee [who had to be a lawful recipient] on the bill, and (3) a $1,000.00 bond posted by the carrier.

Still, the Amendment clearly was before the Court as a logical basis for the decision in both cases if in fact it applied, and in *Carter*, the majority saw fit to reiterate the "through"—"into" dichotomy established in *Collins*.[8] Indeed, New Jersey seems to concede that at least such "through shipments", without more, are beyond the State's power under the Twenty-first Amendment.[9]

In two recent cases, the Supreme Court has reexamined the reach of the Twenty-first Amendment, this time in regard to liquor transactions within the regulating state which involve something more than mere transit through its territory. These cases hold that tax free in bond liquor brought into the State, stored there and then sold for ultimate distribution and use in foreign commerce, all under Federal supervision, is not subject to the Amendment; hence, the State may not use its plenary power under the Amendment to prohibit the traffic, although it may still reasonably regulate it under the police power and within the *confines* of the Commerce Clause. *Hostetter*, supra; *Ammex Warehouse*, supra.

In *Hostetter*, the Idlewild Bon Voyage Corporation had devised a method of selling tax free liquor to passengers departing New York's Idlewild Airport for foreign destinations. The New York Liquor Authority threatened to close down the business and Idlewild obtained an injunction.[10]

Affirming, the Supreme Court indicated that if the case fell within the line of decisions applying the Amendment, New York would be totally unconfined by traditional Commerce Clause limitations. 377 U.S. at 330, 84 S.Ct. 1293. However, the Court emphasized that the Twenty-first Amendment and the Commerce Clause, "Like other provisions of the Constitution, *each must be considered in light of the other, and in the context of the issues and interests at stake in any concrete case.*" Id. at 332, 84 S.Ct. at 1298. [Emphasis supplied].

New Jersey interprets this to mean that the State's power under the Twenty-first Amendment may be somewhat diminished when the interests protected by the Commerce Clause are sufficiently strong. Brief for the Defendant, p. 22.

■ On the contrary, we read *Hostetter* as requiring a case by case consideration of the national interests protected by the Commerce Clause, not merely to measure the extent of State power under the Twenty-first Amendment, but rather to determine whether the Amendment applies at all to the liquor in question; in a word, whether the liquor enters New Jersey "for delivery or use therein."

This is made clear by the Court's emphasis on the "ultimate delivery and use"

8. "It has also been held that shipment through a state is not transportation or importation into the state within the meaning of the Amendment. Collins v. Yosemite Park Co., 304 U.S. 518, 535, 538, 58 S.Ct. 1009." 321 U.S. 131, 137, 64 S.Ct. 464, 468.

9. "The apparent bases of these decisions [*Duckworth* and *Carter*] seems to be that it was necessary to rely upon the police power since there was neither 'distribution' nor 'use' within the states, thus obviating the applicability of the Twenty-first Amendment." Brief for the Defendant, pg. 16.

10. The mode of operation was as follows: after producing his ticket indicating imminent departure, the customer was allowed to place his order, pay for it, and accept a receipt. Then the liquor, which had been in bond from the moment of entry into New York, was transferred directly to the aircraft under Customs supervision. On board, it was held in custody by the airline, still in bond, and was not delivered over to the customer until he reached his foreign destination. Idlewild conducted these operations pursuant to the Tariff Act of 1930, as amended, and the same Internal Revenue Statutes and Customs Regulations under which Stratford operates as outlined above, supra p. 4.

Idlewild did not have a New York sales license and the New York Liquor Authority had ruled that it was unlicensable under New York law, but could not continue its sales without one. N. Y. Alcoholic Beverage Control Law, McKinney's Consol. Laws, c. 3–B, §§ 3(28), 100(1), and 105(2).

of the liquor sold by *Idlewild*, and by its resolution of *Hostetter* within the *Collins, Johnson, Carter* line of decisions. Reviewing the accommodation of State and Federal interests in *Collins*, where the Court found no importation into the State within the meaning of the Amendment, Mr. Justice Stewart concluded:

> "We may assume that if in *Collins* California had sought to regulate or control the transportation of the liquor there involved from the time of its entry into the State until its delivery at the national park, in the interest of preventing unlawful diversion into her territory, California would have been constitutionally permitted to do so. [Citing *Duckworth* and *Carter*, supra]. But the Court held that California could not prevent completely the transportation of the liquor across the State's territory for delivery and use in a federal enclave within it.
>
> *A like accomodation of the Twenty-first Amendment with the Commerce Clause leads to a like conclusion in the present case. Here ultimate delivery and use is not in New York, but in a foreign country.* The State has not sought to regulate or control the passage of intoxicants through her territory in the interest of preventing their unlawful diversion into the internal commerce of the State. * * * Rather, the State has sought totally to prevent transactions carried on under the aegis of a law passed by

Congress [the statutory scheme for tax free in bond liquor] in the exercise of its explicit power under the Constitution to regulate commerce with foreign nations. This New York cannot constitutionally do." 377 U.S. at 333, 84 S.Ct. at 1299. [Emphasis added].

*Ammex Warehouse*, supra, involved substantially the same constitutional issue as *Hostetter*. Two California corporations located near the Mexican border proposed to sell tax free liquor to tourists bound for Mexico, with the liquor remaining in bond and under Customs supervision until the customer reached Mexican territory. While the plaintiffs' business had not actually commenced, they had made substantial investments, and the California Liquor Authority had ruled that their operations would be illegal under California law.[11]

The three judge court reviewed California's regulatory authority both under the Twenty-first Amendment and under the police power; it concluded that the liquor in bond and under Federal supervision remained within the protection of the Commerce Clause. 224 F.Supp. at 555. Finding the reasoning of the District Court in the *Hostetter* case dispositive,[12] it held the proposed transactions beyond the scope of California's Twenty-first Amendment powers:

> "We read these cases as holding that a State may *reasonably regulate* interstate or foreign shipments of liquor

11. The plaintiffs' bonded warehouses, located one mile from the international border, contained a bonded storage area and a display room open to the public. Customers ordered their liquor at the display room, paid for it, and received a receipt. The liquor, which had been continuously in bond from the moment of entry into California, was withdrawn from the warehouse and transported to the U. S. Customs Export official station" at the border. There it was consigned to United States Customs officials for physical delivery to the customer immediately prior to his entry in Mexico. As in *Hostetter*, the withdrawal, transfer, and delivery of the liquor were all accomplished pursuant to the Federal regulatory

scheme provided by the Tariff Act of 1930 and under which Stratford now operates. Supra pg. 4.

The California Department of Alcoholic Beverage Control maintained that the proposed sales were unlawful without a State license but the Court found that the plaintiffs' proposed operations were not licensable under any of the alternative licenses available. 224 F.Supp. at 552.

12. Idlewild Bon Voyage Liquor Corp. v. Epstein, 212 F.Supp. 376 (1962). The District Court opinion in *Ammex* came after the New York District Court's decision, but before the Supreme Court affirmed that decision in Hostetter v. Idlewild Bon Voyage Corp.

*for good cause,* and that *where such regulations are reasonable the burden placed on interstate commerce will not require the State regulation to be struck down.* Conversely, however, a State may not prohibit such interstate or foreign shipments." 224 F.Supp. at 557. [Emphasis added.]

Subsequently, the Supreme Court affirmed, per curiam, on the basis of its earlier opinion in *Hostetter.* 378 U.S. 124, 84 S.Ct. 1657 (1963).

## VI.

■ Applying the above analysis to the present matter, this Court finds Stratford's operations to be essentially within the same stream of foreign commerce which was emphasized in *Hostetter* and *Ammex.* The transactions in New Jersey are subject to the same Federal supervision of that commerce, and the "ultimate delivery and use" also occurs outside the State. From these basic parallels and from a consideration of the State and Federal interests involved, we conclude that Stratford's activities are similarly protected under the Commerce Clause and similarly beyond New Jersey's power under the Twenty-first Amendment.

■■ To be sure, there are factual variations among the sales methods employed in each case, but these are not decisive. The imposition of constitutional restraints upon State regulation of commerce turns on the substance of the transaction, not on overly nice distinctions between constructive possession and conditional delivery, or the like. The gist of the matter, in all these situations, is that corporations are selling liquor within the State and transferring physical custody conditioned and controlled by Federal law which destines it for use in foreign commerce. That was why the Commerce Clause applied in *Hostetter* and *Ammex,* that is why it applies with equal force here.[12A]

12A. New Jersey would distinguish the accommodation of the Commerce Clause and the Amendment in the earlier cases on the ground that "[I]n the instant case, not only a solicitation and sale occurs in New Jersey, but there is an actual physical delivery of the alcoholic beverages within this State." Brief for Defendant, p. 22. In regard to *Ammex* this attempted distinction is inaccurate; in any event, it is insubstantial.

In *Hostetter,* the customer made payment and received title to his purchase at the airport. The goods were transferred to the physical custody of the airline and were no longer under Idlewild's control. Nonetheless, since the local interest was preventing diversion and since the transferred liquor still was under Customs supervision, the Court focused on the fact that "ultimate delivery and use is not in New York, but in a foreign country." 377 U.S. at 333, 84 S.Ct. at 1299.

In *Ammex,* there was not only a sale to the ultimate consumer within the State of California, but also a manual transfer to him before he crossed the border. The District Court found this variation immaterial, since the customer thereby received only *"the physical custody of the liquor and [the] possession of the liquor [in a legal sense] remains in the Customs agent until the moment the purchaser*

*crosses the border."* 224 F.Supp. at 556. *"If he does not cross the border, the custody may be taken from him."* Id. at 549. (Emphasis added).

Stratford physically transfers liquor to the shipping lines for distribution to the ultimate consumers on the high seas. Such physical transfer to the passenger carrier also was made in *Hostetter.* But, since Stratford sells to the shipping line, rather than to the consumer, it makes delivery directly to its vendee, as was true in *Ammex.* Neither of these facts sufficed individually to free New York or California from the Commerce Clause, and their coincidence here requires no different result.

New Jersey urges that completion of both an intermediate sale and a delivery to someone other than the ultimate consumer takes the liquor out of any continuous process of exportation for use in foreign commerce.

The direct answer to this is that the sale to the carrier is not "completed" in New Jersey, in view of the finding in *Ammex* that legal possession of such bonded liquor remains in the Customs officer until the border is crossed (or, in our case, until the ship sails beyond territorial waters). If the vessel, or aircraft, or pedestrian tourist fails to leave the United States, Customs may

The more obvious difference between *Hostetter* and *Ammex,* on the one hand, and the present controversy, on the other, is that New Jersey seeks not to prohibit Stratford's sales, but merely to regulate them. In the defendant's view, the matter ends there. The Supreme Court has indicated that New York or California could regulate such traffic to prevent unlawful diversion; "New Jersey is in exactly that position." Brief for Defendant, p. 20.

We disagree. While they provide constitutional guidance, *Hostetter* and *Ammex* are not fully dispositive because they leave off precisely where the ultimate issue before us begins: Is New Jersey's particular attempt to regulate Stratford an unreasonable burden on foreign commerce which Congress seeks to encourage? This question of how far

a State might go in the face of the Federal legislative scheme (short of prohibition) was left open in the two earlier cases since such a determination was not required. Here it is the critical inquiry.[13]

The issue is a narrow one. The Federal scheme does not preempt all State regulation merely because commerce is affected. This possibility was implicitly rejected in *Hostetter.*[14] Nor is there an explicit conflict between the direction of the Federal and State statutes as such. Rather, the significance of the Federal scheme lies in the fact that it delineates both the local and the national interests which must be weighed in assessing the "reasonable necessity" of the burden imposed by the wholesale license requirement.[15] In other words, the Court must determine whether the

reclaim the liquor. More importantly, the liquor's distribution or use in this country remains a Federal offense. The States have no interest in "delivery" as such, but only insofar as such transfers raise the possibility of diversion. Idlewild Bon Voyage Liquor Corp. v. Epstein, supra, 212 F.Supp. at 384. The liquor delivered to Stratford's vendees at dockside is as restricted to foreign use, by passengers and crew, as was the liquor delivered to the airlines in *Hostetter.* In any real sense, then, the liquor must be deemed to be constantly in the stream of foreign commerce.

13. "If the State of California sees fit to pass statutes and regulations directed towards reasonable regulation of the plaintiffs' business, this will be another case for another day." *Ammex,* supra, 224 F.Supp. at 557.

Far from ignoring the requirement of reasonableness, the dicta in *Hostetter* and *Ammex* both advert to it. Thus, New Jersey may regulate such traffic "to the extent that no undue burden [is] placed on interstate or foreign commerce." Id. 224 F.Supp. at 555. In *Duckworth,* the Court summarized: "The Arkansas statute does not forbid or preclude or interfere with the free flow of commerce among the states beyond what is reasonably necessary to protect the local interest in preventing distribution and use of liquor within the State. It does not violate the Commerce Clause." 314 U.S. at 396, 62 S.Ct. 311. Compare the assess-

ment of the burden in *Carter* supra, 321 U.S. at 135, 64 S.Ct. 464. Both discussions are referred to by implication in the *Hostetter* dictum which hypothetically considers State regulation. 377 U.S. at 333, n. 12, 84 S.Ct. 1293.

14. *Hostetter* noted the Congressional exercise of its power over foreign commerce, but made clear that New York was not thereby precluded from all supervision of the liquor even if the liquor is bound by Federal law for foreign use. The requisite clarity of intent to preempt is clearly lacking. "In determining whether state regulation is pre-empted by federal action, 'the intent to supersede the exercise by the state of its police power as to matters not covered by the Federal legislation is not to be inferred from the mere fact that Congress has seen fit to circumscribe its regulation and to occupy a limited field.'" Huron v. Portland Cement Co., supra, 362 U.S. at 443, 80 S.Ct. at 816.

15. New Jersey apparently assumes that any regulation directed toward the matter of diversion is *ipso facto* a reasonable measure and not an undue burden. The fact that a statute is rationally designed to effect a valid objective bears primarily on whether the State has discriminated against interstate commerce. But even in areas of concurrent State and Federal jurisdiction, local statutes may *neither* discriminate *nor* otherwise impose an undue burden on such commerce. See supra, p. 931. The first requirement does

burden imposed on foreign commerce, and on the national interest therein, is justified by "the character of the local interests and the available means of protecting them." Dean Milk Co. v. City of Madison, 340 U.S. 349, 354, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1950); Southern Pacific Co. v. State of Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).[16]

■ · The local interest is clearly defined. Assertion of the police power over federally supervised liquor in bond is predicated on the danger of diversion; to the extent that it minimizes this danger, the Federal scheme, while not preempting State action, reduces its justifiable scope.

The Tariff and Internal Revenue statutes and the Customs Regulations under which Stratford is already operating are elaborate; indeed, they constitute a maze of regulation. The provisions for supervising physical transfer or delivery of the liquor are particularly detailed. supra, p. 927, n. 3. The comprehensive policing covers the entire period for which the liquor is in New Jersey. The Director has "neither alleged nor proved the diversion of so much as one bottle of plaintiffs' merchandise to users within the State of [New Jersey]." Idlewild Bon Voyage Liquor Corp. v. Epstein, supra, 212 F. Supp., at 386.

■ In this context, the Class B. wholesale license applied to Stratford inherently exceeds the limited sphere reserved for State action in regard to such liquor trade. The cases indicate no more than New Jersey's power to oversee the storage and movement of the bonded shipments through her territory. Moreover, those decisions actually approving some regulation involved no comprehensive Federal scheme remotely comparable to that presented here.[17] Yet the wholesale license subjects Stratford to the Director's wide ranging power to regulate all aspects of the sales transactions themselves, as well as other facets of its business having little if any relation to the minimal dangers of diversion.[18]

not concern us here; there is no indication that Section 33:1–11 applies unequally or unevenly to interstate and intrastate trade.

16. In *Dean Milk*, the Court was weighing an allegedly discriminatory statute against alternative measures available to the city, but the logic applies with equal force in the case of an allegedly unreasonable, though not discriminatory, burden when the national interest involved is sufficiently clear. See Bibb v. Navaho Freight Lines, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed. 2d 1003 (1956); Southern Pacific v. State of Arizona, supra.

17. The transportation permits and procedures upheld in *Carter* and *Duckworth* were not only exceedingly limited, they were clearly needed to channel the shipments into known paths and patterns which could be policed. *Duckworth*, supra, 314 U.S. at 391, 62 S.Ct. 311 (Oral argument for appellee). In this connection, Mr. Justice Black's concurring remarks in *Carter* are illuminating by way of comparison to the extent of the instant local interest: "Virginia seems to think that, unless adequate precautionary regulations are devised and enforced, liquor shipments ostensibly being transported through her territory to a neighboring state could be diverted for bootleg purposes contrary to her laws. Such precautionary regulation must come either from Virginia or the federal government. The legislature of Virginia has provided them; the Congress has not. This Court could invalidate the Virginia regulations, but only the Congress could devise and substitute effective federal regulations to take their place." 321 U.S. at 139, 64 S.Ct. at 469. In our case Congress has.

18. Section 33:1–11 itself merely states that the Class B wholesale licensee shall operate "subject to rules and regulation * * *" This proviso is implemented by Section 33:1–39 which lists the broad range of subjects over which the Director may issue rules and regulations appropriate to the subjects encompassed by each class of license. For the impressive sweep of the Director's powers over, *inter alia*, wholesale transactions and distribution within New Jersey, see Boller Beverages, Inc. v. Davis, 38 N.J. 138, 183 A.2d 64 (1962). "Section 39 * * * then goes on in a second paragraph to specify some 30 detailed categories which general rules and regulations may cover, some of which relate to matters also the subject of specific statutory sections and others of which are not otherwise men-

Through cooperation with Customs authorities, New Jersey can obtain considerable information for its own efforts to keep tabs on plaintiffs' local inventories and their disposition. Whatever additional safeguards New Jersey might legitimately require to supplement and corroborate the existing Federal controls could also be accomplished via the less restrictive and less burdensome device of the transport Class D license for which the plaintiffs have applied.

■ Such a license, issued under N.J.S.A. 33:1–13 and augmented by rules appropriate to its scope, would provide ample authority to permit some supervision of the liquor's transport and transfer until it left the State on board the departing vessels. The fact that Class D licenses would not support regulation of the sales transactions themselves is of no moment; for whatever Stratford's terms of sale, method of solicitation or means of competition, it is the physical movement and storage of the liquor itself which creates the opportunities for diversion. And the physical control would be ensured by the web of Federal and State inspection and custody.[19]

■ The Federal scheme under which Stratford operates not only delimits the legitimate local concern; it also pinpoints the particular national interest against which that local concern must be balanced.

■ Here, the national interest is more than the general desirability of freely flowing goods. In the case of liquor sold in bond for shipment and use as ships' stores or at foreign destinations, Congress has spelled out a specific interest by enacting the aforementioned complement of tariff, internal revenue and customs statutes and regulations. It is the expression of Congressional policy embodied therein which concretely indicates the national interest involved.

Collectively, these statutes and regulations provide for withdrawal of the liquor from bonded warehouses and for its sale and export, all free of such duties and internal revenue taxes as would normally be imposed. (The exemption from import duties, of course, applies only to liquor previously imported.) Where such taxes and/or taxes have already been paid, the scheme provides for a "drawback" (a refund) thereof upon proof of export in accordance with Federal procedures. 19 U.S.C. §§ 1309, 1313, 1317; 26 U.S.C. §§ 5012, 5062, supra.

■ The supervisory aspects of this scheme, detailed above, are necessary to ensure compliance. But they should not obscure its basic purpose; namely, to encourage and promote such trade by improving the American merchant's competitive position. In short, the entire legislative and administrative apparatus constitutes a Congressional regulation of foreign commerce designed to relieve the liquor of domestic financial burdens which might hinder the merchant's ability to meet foreign competition. McGoldrick v. Gulf Oil Corp., 309 U.S. 414, 60 S.Ct. 664, 84 L.Ed. 840 (1939); National Distillers Products Corp. v. City and County of San Francisco, 141 Cal.App.2d 651, 297 P.2d 61,

tioned in the act, and winds up with sweeping authority to promulgate regulations relating to practices unduly designed to increase consumption of alcoholic beverages * * * and such other matters whatsoever as are or may become necessary in the fair, impartial, stringent and comprehensive administration of the law." Id. at 151, 183 A.2d at 71.

19. Of course, this is not to imply that New Jersey would have carte blanche authority to regulate Stratford in any way it chose even under the Transportation license. We need place no such imprimatur on the Class D permit or the permissible scope of regulations thereunder applicable to Stratford. The validity of the transportation license requirement is not before us since the plaintiffs have agreed to accept one. If its implementation leads to rules applied to Stratford which are challenged as outside the sphere permitted New Jersey by *Hostetter* and *Ammex*, that too will be "another case for another day."

cert. denied 352 U.S. 928, 77 S.Ct. 227, 1 L.Ed.2d 163 (1956).

In *McGoldrick,* New York imposed a sales tax on petroleum which the defendant had manufactured from crude oil imported under bond and refined in bonded warehouses in New York. The petroleum was sold for export and use as maritime oil, and the operation was carried on pursuant to sections of the 1930 Tariff Act and the Internal Revenue Code parallel to those involved here, but designed to accord the exemptions to fuel supplies.

The Court did not reach the question of whether the tax constituted a state impost prohibited under the Export-Import Clause.[20] Rather, it concluded that although they involved a tax exemption, the tariff, internal revenue, and customs regulations, taken together, operated as a Congressional exercise of its power over foreign commerce. Therefore, it voided the state tax on the ground that it would defeat the Federal policy of removing the financial burdens imposed on the importer so that he could compete in the sale of ships' fuel. 309 U.S. at 428, 60 S.Ct. 664.

"In furtherance of that end Congress provided for the segregation of the imported merchandise * * * within the state, prescribed the procedure to insure its use for the intended purpose, and by reference confirmed and adopted customs regulations prescribing that the merchandise, while in bonded warehouse, should be free from state taxation.[21] It is evident that the purpose * * * would fail if the state were free at any stage of the transaction to impose a tax which would lessen the competitive advantage con-

ferred on the importer by Congress * * *." Id. at 429, 60 S.Ct. at 669.

In *National Distillers,* the *McGoldrick* decision was expressly relied on and applied to liquor in bonded warehouses being held for shipment and use as ships' stores. San Francisco had imposed a personal property tax on the liquor, some of which was imported from abroad and some of which was domestically manufactured but had either been rectified or bottled in Customs bonded warehouses before being shipped to California. All the liquor was shipped, stored and placed on board vessels under the same procedure of continuous Customs control and custody with which Stratford now complies.

The California court followed *McGoldrick;* it held that both liquor imported from abroad and that manufactured domestically were beyond San Francisco's taxing power, even though both had temporarily "come to rest." The opinion examined the closely parallel scheme involved in *McGoldrick* and noted the equally comprehensive regulation of bonded liquor. It concluded as follows:

"The instant case seems to present a situation that is clearly within the rationale of the Gulf Oil case. Sections 309, 311 and 313 of the Tariff Act of 1930, as amended, Title 19 U.S.C. §§ 1309, 1311 and 1313, provide freedom from internal revenue taxes or for a drawback of taxes paid, when the required procedure is followed for domestic liquors exported, used as ships' stores, or sold to vessels employed in the fisheries. These provisions would seem to constitute regulation of foreign commerce in the instant case just as similar provisions did in the Gulf Oil case.[22] Certainly

20. The Court assumed, without deciding, that apart from the Federal bonding scheme, the oil once manufactured would lose any tax free status it might have as an import. Id. at 423, 60 S.Ct. 664.

21. The Court was referring to Article 942, Customs Regulations of 1932, which expressly exempted bonded goods from state taxation. However, the Court noted that: "The Customs regulation prescribing exemption from state taxa-

tion, * * * *states only what is implicit in the Congressional regulation of commerce presently involved."* Id. at 429, 60 S.Ct. at 669. (Emphasis added).

22. The appellate court did not discuss the validity of the tax imposed on liquor which had been manufactured abroad and shipped directly to San Francisco, because the defendant conceded that its remission by the trial court had been correct. 297 P.2d at 62.

the purpose of the regulatory scheme is to encourage commerce and give a competitive advantage to these items. If states or their political subdivisions were allowed to impose taxes on these items an interference with this purpose would result." 297 P.2d at 65.

The District Court in *Ammex* cited both the decision in *McGoldrick* and the reliance upon it in *National Distillers* with apparent approval, but only for the limited proposition that such bonded liquor remains in the stream of foreign commerce and "never become part of the common mass of goods in the State." 224 F.Supp. 546 at 555.

■ Plaintiffs rely on the conclusion in *McGoldrick* and *National Distillers,* but ask us to take that reasoning one step farther. New Jersey's requirement is not a mere revenue measure; it exacts a fixed fee presumably incidental to a regulatory license. Since no direct tax has been imposed on Stratford's liquor or sales, these two decisions do not directly apply. They teach that the purpose of the Federal scheme preempts direct state taxation—whether for revenue, retaliatory or protectionist ends. On the other hand, *Hostetter,* read in. light of the earlier "through shipment" cases, sanctions nominal license fees necessary to defray the costs of reasonable inspection measures. See p. 936, supra, n. 13; compare *Carter* supra, 321 U.S.

142, 64 S.Ct. 464 (Frankfurter J., concurring).[23]

Hence, for plaintiffs, the relevance of *McGoldrick* and *National Distillers* is this: they clearly establish the Federal policy of minimizing public financial burdens incurred by those in Stratford's position. Plaintiffs' point is that the wholesale license unduly burdens their foreign commerce precisely because it defeats that policy—and the underlying national interest—more than is reasonably necessary in light of the available alternative.

■ The difference is not academic. The $200 annual fee for a Class D transportation license would not significantly burden Stratford's trade; the $3,000 annual fee for a Class B wholesale license, payable regardless of Stratford's volume or profit, is another matter. Such a substantial surcharge would have a far more chilling effect on the commerce which Congress sought to foster, thereby undermining the main purpose of the Federal legislation. Thus, the interference with the specific national interest is clear.

New Jersey's argument that the existence of the Federal legislation in no way inhibits concurrent State regulation, Brief for the Defendant, p. 22, misses the point by directing itself only to the issue of preemption and ignoring the national interest embodied in the Federal scheme.[24]

23. Since this is not a case of direct taxation per se, we cannot say that there is a sufficiently direct and explicit conflict between the State and Federal statutes, that the former must fall simply as a contravention of the latter under the Supremacy Clause. See p. 936, supra, n. 14.

24. New Jersey first relies on the Federal Intoxicating Liquor Act, 27 U.S.C. §§ 203, 204, which requires a Federal permit and then conditions that permit upon, *inter alia,* full compliance with State law and the States' exercise of their powers under the Twenty-first Amendment. Since we have already indicated that Stratford does not transport liquor into New Jersey "for delivery or use therein" within the meaning of the Amendment, it is unclear how New Jersey can derive support from Section 204(d).

As for compliance with State law generally, required by Section 204(a) (2), we assume this condition is limited to State laws which are otherwise constitutional. It cannot be used as a bootstrap to cure constitutional infirmities, not based on any notion Congress has preempted the field, but found from other legislative expressions of the national interest.

Secondly, New Jersey relies on Boller Beverages, Inc. v. Davis, supra. In *Boller,* the State Supreme Court ruled that New Jersey might regulate or prevent the use of certain labels and bottle shapes for liquor, despite the fact that they had already been approved by the Federal Alcoholic Administration acting under pertinent Federal statutes and regulations. 26 U.S.C. § 5301; 27 U.S.C. § 201 et seq.; 27 C.F.R. 5.1 et seq. This case is inap-

To be sure, New Jersey retains wide latitude in the exercise of its police power to regulate matters of local concern even though interstate commerce is incidentally affected; and, as we have noted, this scope is exceptional in the case of intoxicants. And we are aware that courts ordinarily will not second guess a State's choice of means it feels desirable to effect constitutionally legitimate ends.[25] Nonetheless, the judiciary, "and not the state legislature, is under the commerce clause the final arbiter of competing state and national interests." Southern Pacific Co. v. State of Arizona, supra, 325 U.S. at 769, 65 S.Ct. at 1520. Between the extremes of cases where the State law clearly is or clearly is not impermissible, lies the great spectrum of cases which must be judicially resolved by evaluating the nature and extent of the restraints and burdens imposed. Id. at 768, 770, 65 S.Ct. 1515.[26]

Here, examination of all the factors heretofore discussed makes it apparent that the restraint has not been justified. New Jersey has shown no reasonable necessity for the wholesale license requirement to achieve its limited task. We hold that the burden imposed is so substantial, and the ensuing interference with national policy so clearly avoidable, that the application of N.J.S.A. 33:1–11 to Stratford must fall as an impermissible restraint on foreign commerce. We concur with the plaintiffs that such a requirement is defective both in that it imposes the undue burden we have just examined and that it subjects Stratford to inherently excessive State regulation.

## VI.

The plaintiffs also challenge the wholesale license requirement as a violation of the Export-Import clause of the United States Constitution. Article I, Section 10, Clause 2 provides that:

> "No State shall, without the Consent of Congress, lay any Imposts or Duties on Imports or Exports, *except what may be absolutely necessary for executing its inspection Laws.*" (Emphasis added).

Generally, the States may not interfere with the Federal power over exports and imports while the goods are still in the course of foreign commerce. Texas & New Orleans R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442 (1913); and taxes thereon are invalid. Department of Revenue v. James Beam Dist. Co., 377 U.S. 341, 84 S.Ct. 1247, 12 L.Ed.2d 362 (1963).

In the *Beam* case, the Kentucky Court of Appeals had found that the state license tax, which involved a fixed pay-

posite for two reasons. First, the attempt to distribute liquor in the challenged packaging within New Jersey was treated as clearly coming under the Twenty-first Amendment and, hence, subject to New Jersey's plenary powers. Second, the Court stressed that the Federal authorization requirement had the limited purpose of protecting Federal revenue, and was neither occupation of the field, nor incompatible with State regulation of the packaging for other purposes. The decision in this regard was no more than an application of the principles applied in *Huron Cement*, discussed supra, where the practical impact of the State law did not undermine the Federal purpose.

25. "If there are alternative ways of solving a problem, we do not sit to determine which of them is best suited to achieve a valid state objective." Bibb v. Navaho Freight, supra, 359 U.S. at 524, 79 S.Ct. at 965. Still, the statute in *Bibb* was struck down as an unreasonable burden. Both *Southern Pacific* and *Bibb* concerned potential disruption of nationally uniform requirements necessary for efficient railroad or trucking operations. Here, the national interest, while different, is equally clear. The issue is not the best way to achieve the local objective, but rather the possibility of avoiding unreasonable interference with the national interest in the commerce. Cf. *Dean Milk*, supra.

26. "But to let each locality conjure up its own dangers and be the judge of the remedial restraints to be clamped onto interstate trade inevitably retards our national economy and disintegrates our national society." Jackson, J., concurring in *Duckworth*, supra, 314 U.S. at 401, 62 S.Ct. at 316.

ment per bottle of liquor brought into the State from abroad, was in fact a tax on imports. The Supreme Court concurred and struck down the tax on the ground that the Twenty-first Amendment does not permit "what the Export-Import Clause precisely and explicitly forbids". 377 U.S. at 344, 84 S.Ct. at 1249.

In *Hostetter,* the Supreme Court dismissed the Export-Import Clause as irrelevant to New York's complete prohibition of the challenged business. 377 U.S. at 327, n. 3, 84 S.Ct. 1293. In *Ammex,* although complete prohibition was at issue, the District Court did discuss the Export-Import Clause, in connection with the liquor's "in bond" status. See p. 934, supra. But that Court did not clearly indicate what part, if any, the Clause played in the final result; the decision seemed to follow the lower court in *Hostetter* and rely solely on the Commerce Clause.

Here the goods are also in bond and held for export. However, neither an ad valorem tax, nor a complete prohibition is involved, but only a regulatory inspection measure and license fee. Hence, even if the liquor held for sale and delivery by Stratford is deemed an import or export within the protection of the Export-Import Clause, and further assuming the license fee can fairly be considered an impost or duty, it would still remain to interpret the exception to that Clause which permits even imposts or duties where they are "absolutely necessary to execute the State's inspection laws". C.f. *Beam,* 377 U.S. at 345, 84 S.Ct. 341.

We refrain from passing on any of these questions since we find no issue raised by the defendant's contentions that cannot be resolved under the Commerce Clause on which the plaintiffs have placed primary reliance. Moreover, the last mentioned question would involve similar considerations to those we have already examined in Part V. of this opinion.

Accordingly, this Court will enjoin the State of New Jersey from enforcing or attempting to enforce Section 33:1–11 of the New Jersey Alcoholic Beverage Control Law. Counsel for the plaintiffs shall submit, on notice to the defendant, an appropriate order.